496 F.2d 1032
 ORIENT MID-EAST LINES, INC. and Astronato Cia. Nav. S.A. as
interest may appear, Plaintiffs-Appellants-Cross Appellees,
v.
A SHIPMENT OF RICE now or lately ON BOARD the S S ORIENT
TRANSPORTER, In Rem, and The Republic of Vietnam, Tong Cuoc
Tiep Te (General Supply Agency) andCong-Ty Bao Hiem Tai Bao
Hiem Vietnam, Defendants-Appellees-Cross Appellants.
 No. 73-2096.
 United States Court of Appeals, Fifth Circuit.
 June 27, 1974.
 
 Kenneth D. Kuykendall, George W. Renaudin, Houston, Tex., Wharton Poor, R. Glenn Bauer, New York City, for plaintiffs-appellants.
 Hubert Oxford, III, Beaumont, Tex., John J. Loflin, New York City, for defendants-appellees.
 Before RIVES, WISDOM and MORGAN, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 Damage sustained by the S.S. Orient Transporter draws us into the esoteric world of 'general average', the ancient maritime doctrine that 'loss for the common benefit which is incurred by one who partakes in a maritime venture should be shared ratably by all who participate in the venture'. Cia. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., D.Md.1967, 274 F.Supp. 884, 891. General average may go back to the Phoenicians, but undoubtedly it was practiced in Rhodes at least as early as 300 B.C., and was accepted throughout the Mediterranean world long before it was neatly formulated in the Digest of Justinian. Its fundamental principle is stated in a chapter in the Digest headed Lex Rodia de Jactu: If goods are thrown overboard in order to lighten the ship, what is sacrificed for the common good should be made good by a common contribution. Dig. XIV, 2, 1 pr. See F. Sanborn, Origins of The Early English Maritime and Commercial Law 5, 14-16 (1930); R. Lowndes & G. Rudolph, The Law of General Average PP1-3 (9th ed. 1964).[1] Today the principle covers a wide range of maritime losses, from damage done in quenching a shipboard fire to expenditures incurred in a port of refuge. General average concepts are not free floating maxims of admiralty law. They have been made subject to the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. 1300-1315,[2] and the York/Antwerp Rules, modern codifications of Lex Rodia de Jactu, are typically incorporated in charter parties and bills of lading.
 
 
 2
 The plaintiffs-appellants sought general average contribution for damage sustained by the Orient Transporter in two different incidents-- grounding in the Neches River, Texas, and destruction of the ship's high pressure turbine on the high seas. The district court held that under COGSA general average does not apply to the damage sustained by the Orient Transporter, because the damage was caused by unseaworthiness and the plaintiff shipowners[3] in neither instance exercised due diligence to make the ship seaworthy. The South Vietnamese interests, the defendants-appellees, counterclaimed for expenses incurred in unloading, storing, inspecting, fumigating, and reshipping the cargo after the Orient Transporter lost her propulsion system through the destruction of her high pressure turbine. In addition, they counterclaimed for recovery of a deposit paid as the cargo's general average share of the salvage expenses incurred in towing the Orient Transporter to Panama and then back to Beaumont, Texas, after the turbine damage. The district court held that the claim for unloading, inspecting, fumigating, storing, and reshipping expenses was barred by COGSA's one year statute of limitations. 46 U.S.C. 1303(6). The court awarded the defendants-appellees $61,933.99 plus interest, as the deposit in the salvage action. We affirm.
 
 I. FACTS
 
 3
 On April 15, 1970, Orient Mid-East Lines, Inc. contracted with the Commodity Credit Corporation of the United States Department of Agriculture, acting on behalf of the South Vietnamese Government, to transport 10,000 long tons of rice from the United States to Vietnam. The vessel to be used, the S.S. Orient Transporter, was warranted to be 'tight, staunch, and strong, and in every way fitted for the voyage'. The charter party incorporated COGSA[4] and contained a 'Jason clause':
 
 
 4
 In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which the carrier is not responsible by statute, contract or otherwise, the goods, consignees or owners of the goods shall contribute with the carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred in respect of the goods.
 
 
 5
 Any general average contribution was to be payable according to the York/Antwerp Rules, 1950.
 
 
 6
 The Orient Transporter took on a full cargo of rice at Mobile, Alabama, and Beaumont, Texas. At Mobile repairs were made to the starboard boiler. A surveyor from Lloyd's Register of Shipping noted on May 27, 1970, that the port boiler should undergo similar repairs 'at the earliest opportunity, but not later than 7/70 (2mos)'. Loading of rice continued at Beaumont and was completed on June 6, before the port boiler had been repaired. Because the port authority at Beaumont wanted to use the loading berth for another ship, the Master of the Orient Transporter took the ship, under the guidance of a pilot, to an abandoned ship channel in the Neches River where she was intentionally grounded on the soft silt bottom to permit repair work on the port boiler. The bottom of the Neches River proved an unsuitable anchorage, however, apparently because the main condenser and other piping was blocked by silt. With difficulty the ship was removed from the mud and silt. When the ship finally broke free, it moved rapidly backwards across the river. Because of poor communications between the Master and the engine room and a lack of power,[5] the ship did not reverse its direction until the stern barely avoided a dock and a cluster of pilings on the opposite side of the river. When the ship finally moved forward, it again traversed the channel and again grounded its bow in the mud and silt. It was then low tide, and the vessel could not free itself; the Master decided to wait until high tide the next morning. Before dawn the Master discharged 179 tons of fresh water. Later, at high tide, the vessel was floated with the aid of a tug boat and proceeded back to Beaumont for repairs. The Neches River episode resulted in expenses of $8,990.84.
 
 
 7
 After repairs were finally completed, the Orient Transporter sailed for Vietnam by way of the Panama Canal. At the time it left the pier on June 14, 1970, the ship's engine room crew was short at least one fireman, two oilers, and a wiper, but the wiper, one Fetaxidis, and an oiler were later returned to the ship by the police before the ship left American waters. In Fetaxidis's absence, he was signed off as a wiper and signed on as a fireman, a step up in the engine room hierarchy. Fetaxidis was 17 or 18 years old and had no record of formal or informal training as a fireman.[6]
 
 
 8
 A fireman shoulders considerably more responsibility than does a wiper. Testimony at trial established that a wiper's duties are essentially janitorial. A fireman, on the other hand, must know at all times the water level in the boilers. It is a vital task: too little water can result in an explosion; too much water can result in an overflow into the turbines which will destroy the turbine blades. The fireman also regulates the water level, by opening and closing feed lines. At the trial an expert testified that a fireman should always inform the engineer on watch if he has opened an extra feed line. Moreover, the expert stated that in a vessel such as the Orient Transporter, not equipped with an automatic watering device, a fireman should not open a feed valve without authorization from the engineer.
 
 
 9
 To check the water level in the boilers in the Orient Transporter, one looked at a vertical glass gauge approximately 15 inches long, similar to the transparent tube on the side of an electric coffee pot. The level in the gauge indicated the actual level in the boiler. So long as the water level in the boiler remained within the 15-inch limits of the gauge, the bow formed by the surface tension on top of the column of water was clearly visible through the glass. But if the water dipped below or rose above the level measured by the gauge, it was difficult to tell whether the gauge was full or empty, and thus whether the boiler contained too much or too little water. Testimony at trial established that when the water level cannot be seen through the gauge the proper procedure is to 'blow down' the glass by draining the gauge and watching to see if water refills the glass. If it does, the water level is too high; if water does not refill the glass, the level is too low. Christopher Finley, Chief Engineer with Gulf Oil Corporation, testified that any competent fireman could blow down the water glass.
 
 
 10
 On June 21, 1970, at approximately 2110 hours Fetaxidis was on watch as fireman, and one Dimitrios Spetsiotis was the engineer on watch. Spetsiotis was in the lower engine room changing oil in the lube oil pump when Fetaxidis appeared and said that he could not determine the water level in the boiler; furthermore, he did not remember if, the last time he had checked, the water level was low or high. The two men returned to the fireman's station. They could not see the water level in the glass. Spetsiotis tried to blow down the glass, but he still could not ascertain whether the boiler contained too much or too little water. Fearing an explosion, he turned on the boiler water feed pump and fed cold water directly into the boiler.[7] The results were catastrophic for the Orient Transporter. About a minute later loud noises came from the engine room, strong vibrations shook the vessel, and steam rose from the main engine. The water in the boiler, already high before Spetsiotis turned on the feed pump, had 'carried over' into the turbines. The blades of the high pressure turbine were destroyed, and the turbine was rendered inoperative. Without notifying Spetsiotis, Fetaxidis had turned on an extra feed line. Damage to the propulsion system to talled $180,863.17.
 
 
 11
 The Orient Transporter was unable to proceed under her own power. A salvage tug brought the ship to the Panama Canal. It was there determined that a new turbine would be required. Because the turbine could not be supplied at the Panama Canal, the Orient Transporter was towed back to Beaumont. At Beaumont the cargo of rice was discharged, and arrangements were made to reship it to Vietnam aboard another vessel. Because of the cost and delay anticipated in procuring a new turbine, it was finally determined that repair of the Orient Transporter would be uneconomical. On October 1, 1970, she was sold for scrap.
 
 
 12
 II. THE CLAIMS FOR GENERAL AVERAGE CONTRIBUTION
 
 
 13
 The plaintiff shipowners sued for contribution in general average for the damage to the Orient Transporter and for other expenses arising out of both the Neches River incident on June 6 and 7 and the destruction of the high pressure turbine on June 21. The district court found that the ship was unseaworthy in both instances and that the plaintiffs had not established their due diligence to make the ship seaworthy. COGSA provides:
 
 
 14
 (1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to--
 
 
 15
 (a) Make the ship seaworthy;
 
 
 16
 (b) Properly man, equip, and supply the ship;
 
 
 17
 (c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.
 
 
 18
 46 U.S.C. 1303. If through lack of due diligence the carrier fails to provide a seaworthy ship, the carrier may not recover in general average for damage proximately caused by the unseaworthiness.
 
 
 19
 The record in this case supports the court's finding that the Orient Transporter's port boiler was in an unseaworthy condition during the Neches River difficulties.[8] The surveyor from Lloyd's Register of Shipping had noted in Mobile that the boiler should be repaired 'at the earliest opportunity'. Furthermore, another surveyor, who had examined the Orient Transporter after the Neches River incident, testified that without the boiler repairs the vessel was unseaworthy. The Master had apparently intended to repair the boiler during loading at Beaumont, but, for reasons not clear, repairs had not been accomplished by the time that loading was completed. The soft silt bottom of the abandoned channel of the Neches River was clearly intended as an anchorage where the final preparations to make the vessel seaworthy for the voyage could be carried out. It was this attempt to make the ship seaworthy which precipitated the damage and loss caused by the subsequent attempts to float the ship free.
 
 
 20
 When unseaworthiness of the vessel has been proved, the carrier may nonetheless avoid the adverse consequences that would otherwise flow by showing that is exercised due diligence to make the ship seaworthy before the incident. 46 U.S.C. 1304. The appellant made little attempt to offer proof on this point at the trial below. In fact, such a showing could hardly have been made; it was during an attempt to make the ship seaworthy that the damage and loss for which general average contribution is sought occurred.
 
 
 21
 Recovery is foreclosed here by more than the unseaworthiness of the vessel; the damage and loss complained of does not in any event warrant general average contribution. General average concepts apply only to action taken for the common safety when the ship and its cargo are in peril. Star of Hope, 1869, 76 U.S. (9 Wall.) 203, 19 L.Ed. 638; Columbian Ins. Co. v. Ashby & Stribling, 38 U.S. (13 Pet.) 331, 10 L.Ed. 186; Nicaraguan Long Leaf Pine Lumber Co. v. Moody, 5 Cir. 1954, 211 F.2d 715, 717. We reject the appellants' contention that the York/Antwerp Rules, 1950, incorporated into the charter party in the instant case, have done away with this requirement.
 
 
 22
 First, the York/Antwerp Rules were intended to achieve international uniformity in the adjustment of general average, not to create a new species of general average act. See L. Buglass, General Average & The York/Antwerp Rules, 1950, at 7 (1959); Lowndes & Rudolph, supra, PP225, 290-291. Second, general average act is defined in the rules as 'any extraordinary sacrifice or expenditure . . . intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure.' Youk/Antwerp Rules, 1950, Rule A.[9] It is true, as the appellants point out, that the lettered rules are intended to provide guidance only where the numbered rules do not apply.[10] But we are not persuaded that any numbered rules do away with the requirement that the ship be in a position of peril before the law of general average applies. Rules X and XI, on which the appellants rely, concern expenses incurred at a port of refuge entered as a general average act. Lowndes & Rudolph, supra, P652. Those rules are not applicable to the present situation. Furthermore, even Rules X and XI are limited to actions taken 'for the common safety', a phrase closely related to removal from peril.[11] Finally, it would appear that the plaintiffs' interpretation of the York/Antwerp Rules would run afoul of sections 3(8) and 5 of COGSA, 46 U.S.C. 1303(8) & 1305.[12] See G. Gilmore & C. Black, The Law of Admiralty 5-13 (1957).
 
 
 23
 The district court found that the Orient Transporter was not in a position of peril when resting on the bottom of the Neches River. The facts support this finding. The vessel was far removed from any danger of collision whth another ship, and did not interfere in any way with navigation. The pilot who moved the Orient Transporter from Beaumont to the Neches anchorage testified that the ship would not have been disturbed by heavy weather. Finally, the decision to ground the ship is persuasive evidence that the soft silt bottom in the abandoned ship channel was considered a safe anchorage. We cannot say that the district court erred in finding that this anchorage was safe.[13]
 
 
 24
 We turn to the destruction of the high pressure turbine on June 21, 1970. The district court found that the vessel was unseaworthy: the fireman, Fetaxidis, was inexperienced; the engine room was inadequately manned; and the ship lacked proper equipment. In addition, the court found that the owners did not use due diligence to make the vessel fit prior to the voyage and that this failure caused the accident on June 21.[14] Apparently conceding a lack of diligence,[15] the appellants concentrate their argument on the court's findings of unseaworthiness and causation.
 
 
 25
 An inadequate crew, of course, may create an unseaworthy condition. Waldron v. Moore-McCormack Lines, 1967, 386 U.S. 724, 727, 87 S.Ct. 1410, 18 L.Ed.2d 482; Aguirre v. Citizens Casualty Co., 5 Cir. 1971,441 F.2d 141, 144, cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58; Dillon v. M. S. Oriental Inventor, 5 Cir. 1970, 426 F.2d 977, 979, cert. denied, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140. An inadequate crew may be due either to insufficient manning, see, e.g. June T., Inc. v. King, 5 Cir. 1961, 290 F.2d 404, 407, or to an incompetent crew, see e.g., Horn v. Cia de Navigacion Fruco, S.A., 5 Cir. 1968, 404 F.2d 422, cert. denied, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477; The Vale Royal, D.Md.1943, 51 F.Supp. 412, 426. Here there was convincing evidence of both. Fetaxidis had no experience of training as a fireman. There was testimony at trial that to obtain the status of a certified fireman water-tender, one must have six months experience at sea in the engine department of a merchant vessel and must pass a Coast Guard examination; the National Maritime Union gives an eight to ten week course in preparation for this examination. There was no evidence that Fetaxidis met any of these criteria. Moreover, his incompetence was actively demonstrated. By going to Spetsiotis, Fetaxidis invited the inference that he did not know how to 'blow down' the water glass himself. More importantly, apparently he did not appreciate the necessity of knowing the water level at all times, of keeping the engineer on watch informed as to what feed lines were open, and indeed, of not opening feed lines without the engineer's permission. The evidence clearly established Fetaxidis's incompetence.
 
 
 26
 The inexperience of a crew member does not, of course, necessarily create an unseaworthy condition. Properly supervised, an inexperienced, untrained individual may learn to become competent. Cf. The New York Marine, 2 Cir. 1940, 109 F.2d 564, 565. On the Orient Transporter, however, Fetaxidis's inexperience and ignorance of his job were compounded by a shortage of personnel. The engine department was understaffed by at least one oiler on June 21, and the inference is persuasive that there was no oiler on watch when the accident occurred. When Fetaxidis reported to Spetsiotis, the engineer on watch, that the water level could not be seen in the glass, Spetsiotis was in the lower engine room changing oil in the oil lube pump-- a task usually performed by an oiler. And in Spetsiotis's deposition testimony concerning the events of June 21, there is no mention of an oiler on duty. Although it is possible that the incompetence of the fireman or the lack of an oiler might not, standing alone, have had significant adverse consequences, combined they amounted to an inadequate crew and an unseaworthy condition.
 
 
 27
 The unseaworthiness was exacerbated by primitive boiler-related equipment. The Orient Transporter had no automatic feed equipment, remote level indicators, or automatic alarm system-- any one of which might have prevented the accident.[16] Without such equipment, it was especially important that the ship be adequately manned. In conclusion, we note that seaworthiness is a question of fact. Aguirre v. Citizens Casualty Co., 441 F.2d at 144. The facts, as we read the record, lead us to the conclusion that the district court's findings were not erroneous.
 
 
 28
 The appellants' final contention is tied to the different liabilities under COGSA when damage results from unseaworthiness and when it results from negligent management of the vessel. Under COGSA the carrier is not liable for loss or damage to the cargo resulting from negligent management. 46 U.S.C. 1304(2)(a). Conversely, negligent management will not foreclose a general average recovery by the ship owner, as will unseaworthiness.[17] The appellants argue that the destruction of the boilers resulted form Spetsiotis's negligence, not from any unseaworthy condition. After all, it was Spetsiotis's turning on the feed pump which formed the immediate cause of the carryover of water from the boiler into the turbine. And there was testimony that when there is doubt as to whether the water is too high or too low in a boiler, the proper procedure is to 'shut down' the boiler and stop the main engine. Instead, Spetsiotis took the worse action that he could have taken under the circumstances, as we now know them: he added cold water directly into the boiler.
 
 
 29
 That Spetsiotis's action formed the immediate cause of the accident, however, does not reduce the significance of the inadequacies of the engine room crew. Fetaxidis's incompetence and the lack of an oiler set events in motion that led directly to a crisis situation for the engineer on watch. In an atmosphere of danger created by the possibility of an imminent boiler explosion, Spetsiotis panicked. But for the unseaworthiness there would have been no crisis and no accident. The unseaworthiness was a 'substantial factor' in the accident. See Restatement (Second) of Torts 431, 433 (1965); W. Prosser, Law of Torts 41 (1971). It formed a crucial link in the chain of causation, continued not broken by the response of Spetsiotis.
 
 
 30
 At best the appellants showed that Spetsiotis's action, and perhaps negligence, was a concurrent cause of the catastrophe. This is insufficient to establish a right of recovery here. When there is more than one effective cause, the fact that one cause is excepted under COGSA does not eliminate the carrier's responsibility for unseaworthiness. Hydaburg Cooperative Ass'n v. Alaska Steamship Co., 9 Cir. 1968, 404 F.2d 151, 153; Union Carbide & Carbon Corp. v. The Walter Raleigh, S.D.N.Y. 1951, 109 F.Supp. 781, 793, aff'd, 200 F.2d 908, 2 Cir.; Gilmore & Black, supra, 3-38. We have held that the burden of showing that damage is due to a cause other than unseaworthiness falls on the shipowner. Horn v. Cia de Navigacion Fruco, S.A., 404 F.2d at 432; Cooper v. Pinedo, 5 Cir. 1954, 212 F.2d 137, 143. Furthermore, when there are concurring causes, the burden is on the shipowner to show how much of the damage resulted from a cause entitled to exemption under COGSA. J. Gerber & Co. v. S.S. Sabine Howaldt, 2 Cir. 1971,437 F.2d 580, 588; Lekas & Drivas, Inc. v. Goulandris, 2 Cir. 1962, 306 F.2d 426, 431-432; American Mail Line, Ltd. v. Tokyo Marine & Fire Ins. Co., 9 Cir. 1959, 270 F.2d 499, 502. Because the appellants have not met these burdens, they must bear the entire loss.
 
 III. THE COUNTERCLAIM
 
 31
 In their counterclaim the Vietnamese interests sued for reimbursement of a deposit made as their general average share of salvage costs, and to recover expenditures of more than $100,000 incurred in loading, inspecting, fumigating, storing, and reshipping the rice after the Orient Transporter's propulsion system was rendered inoperative by the events of June 21, 1970.[18] The Vietnamese also claimed an additional $4,000, the value of some 581 bags of rice lost or ruined during transfer. Recovery hinges on the applicability of section 3(6) of COGSA, 46 U.S.C. 1303(6), which provides: 'In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered'. We agree with the district court that the cross-appellants are entitled to recover the salvage deposit and that their other claims are barred under COGSA's one year statute of limitations.
 
 
 32
 The relevant sequence of events, as it appears from the record, is as follows. Towed back to Beaumont after losing its propulsion system, the Orient Transporter arrived on August 7, 1970. While the ship was being unloaded on August 24 the plaintiffs filed their action in rem against the cargo of rice, seeking general average contribution. The unloading of the Orient Transporter was completed on August 27. It was not until February 3, 1972, almost eighteen months after the Orient Transporter had discharged her cargo, that the defendants filed any pleadings in this case. At that time they reserved the right to file a counterclaim at a later date; they did so on September 11, 1972. Apparently conceding that if the one year statute of limitations is applicable to this case their claims are barred, the defendants argue that the statute does not apply.
 
 
 33
 We agree that the one year limit does not apply to the claim for reimbursenment of the salvage deposit. In States Steamship Co. v. American Smelting & Refining Co., 9 Cir. 1964, 339 F.2d 66, cert. denied, 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 155, the court faced a situation similar to that before us now: more than a year after the cargo was delivered, the cargo owner sued for reimbursement of its general average portion of a salvage award. The court held that the action was in actuality for indemnification and that as such was not a claim for 'loss or damage' within the meaning of COGSA; therefore the one year limitation period did not apply. Because the salvage award in the case was not final until more than a year after delivery, the plaintiff could not have brought its claim within the one year period.[19] The Court noted that in the usual action for damage to cargo, it is at the time of delivery that the shipper should become aware of any damage. Wiht indemnity, however, the cause of action accrues only upon actual payment. 339 F.2d at 69-70. We adopt this analysis and hold that the salvage claim is not barred by the one year limitation period of COGSA.
 
 
 34
 The defendants-cross-appellants urge us to extend the rationale of States Steamship to their action to recover espenses and losses borne after the disabled Orient Transporter was towed back to Beaumont. They maintain that, like the plaintiff in States Steamship, they could not have raised their claims within the one year period. We are unconvinced. The record in this case does not indicate that the defendants' causes of action arose after the one year period expired.[20] Moreover, we are of the view that the claims brought in this action are the sort intended to be included within the COGSA time limit. The damaged and missing rice was discoverable during the unloading of the Orient Transporter. This is the typical 'damage or loss' covered by the limitation period of COGSA. All of the expenses for unloading, inspection, fumigation, and storage were incurred within two months of time the rice was discharged. And the costs of reshipment were also incurred within the year. These expenses too are are cargo-related and covered by the limitation period.
 
 
 35
 We note that the federal courts have with consistency strictly applied the one year period when the cause of action arose within a year from delivery. See, e.g., American Oil Co. v. Steamship Ionian Challenger, 2 Cir. 1966, 366 F.2d 509; Minex v. International Trading Co., E.D.Va.1969, 303 F.Supp. 205. We find no reason to depart from this accepted practice in this case.
 
 
 36
 Affirmed.
 
 
 
 [1]
 The ninth edition of Lowndes & Rudolph appears as volume 7 of British Shipping Laws (B. Hewson, ed. 1964)
 
 
 [2]
 'Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter.' 46 U.S.C. 1300
 
 
 [3]
 Astronato Cia. Nav. S.A. owned the Orient Transporter. Orient Mid-East Lines, Inc. owned all the stock of Astronato Cia. Nav. S.A
 
 
 [4]
 The bills of lading were also subject to COGSA. See note 2 supra
 
 
 [5]
 It is unclear what caused the lack of power. The appellants contend that the power was reduced because the condenser and other piping was filled with silt. The appellees imply that it was because of the 'unfitness' of the power equipment, that is, the port boiler
 
 
 [6]
 Fetaxidis did not testify. At the trial the plaintiffs' counsel reported that Fetaxidis had been killed in an explosion at sea
 
 
 [7]
 Usually water is fed first through a heater, where the water temperature is raised before the water enters the boiler. Because he was concerned to get water into the boiler as quickly as possible, Spetsiotis fed cold water directly into the boiler
 
 
 [8]
 Only two witnesses testified at the trial concerning the events of the voyage. These witnesses were two pilots, one who had taken the ship from Beaumont to the abandoned channel in the Neches River on June 6, 1970, and one who had returned the ship to Beaumont on June 7. Much of the other testimony was presented in the form of depositions. We are in as good a position to evaluate such evidence as was the trial court. J. Gerber & Co. v. S.S. Sabine Howaldt, 2 Cir. 1971, 437 F.2d 580, 586. The proper standard of review in such a case is a modified 'clearly erroneous' standard. 'Although we are bound by the clearly erroneous doctrine . . ., it is subject to the modification that it does not apply with equal force, where . . . the appellate court is in as good a position as the lower court to evaluate the testimony that is crucial to the case'. Caradelis v. Refineria Panama, S.A., 5 Cir. 1967, 384 F.2d 589, 593; San Pedro Compania Armadoras, S.A. v. Yannacopoulos, 5 Cir. 1966, 357 F.2d 737, 740
 
 
 [9]
 The York/Antwerp Rules, 1950, may be found in 6 Benedict on Admiralty (7 ed. Knauth ed. 1969); Buglass, supra; Lowndes & Rudolph, supra
 
 
 [10]
 'Except as provided by the numbered Rules, general average shall be adjusted according to the lettered Rules.' York/Antwerp Rules, 1950, Rule of Interpretation
 
 
 [11]
 Lowndes & Rudolph, supra, describe the phrase 'for the common safety' as a 'shorter and more convenient phrase than 'for the purpose of preserving from peril the property involved in a common maritime adventure." Id. at P556. They also note:
 No one at the (Stockholm) Conference (of 1924) . . . expressed any desire to widen the definition of general average so as to include in its scope losses or expenses other than those arising from an intention to save the common adventure from a common peril. In the end not only were the words 'for the common safety' inserted in the definition, but the principle implied by these words was further emphasized by continuing with the phrase 'for the purpose of preserving from peril the property involved in a common maritime adventure.'
 Id. at P550.
 
 
 [12]
 Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, srising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability
 46 U.S.C. 1303(8).
 Nothing in this chapter shall be held to prevent the insertion in a bill of lading of any lawful provision regarding general average.
 Id. 1305.
 
 
 [13]
 The Master stated that he decided to jettison 179 tons of fresh water to ease the floating of the ship 'due to the reason of safety of the vessel and goods'. Although evidence that the ship was in a position of peril, the statement is not conclusive. See Ravenscroft v. United States, E.D.N.Y. 1936, A.M.C. 696, aff'd, 88 F.2d 418, 2 Cir., cert. denied, 301 U.S. 707, 57 S.Ct. 940, 81 L.Ed. 1361. Significantly, the Master jettisoned the water before he dnew whether the tide would float the ship, fresh water and all
 
 
 [14]
 We harbor some doubts as to whether the damage to the high pressure turbine was the result of a general average act under the York/Antwerp Rules, 1950. The parties do not argue the point, however, and because of our disposition of the case we need not face the issue
 
 
 [15]
 Charles Walker, a patrolman for the National Maritime Union, stated that in June 1970 there were twenty-five certified firemen water-tenders in the area available for shipping. He testified that on request he could have obtained a certified fireman water-tender for the Orient Transporter in 'probably two hours'
 
 
 [16]
 All of this equipment is common. Christopher Finley, who had served 26 years as Chief Engineer, testified that he had never served on a ship that did not have remote level indicators and alarm systems
 
 
 [17]
 The effect of the combination of the new Jason Clause and the Carriage of Goods by Sea Act is that once a general average act within 'traditional bounds' is established, cargo will be required to contribute in general average even if the general average loss is due to a cause, such as an error in navigation attributable as negligence to the carrier, if it is determined that the carrier would not be responsible to cargo under the Act for loss resulting from such cause. The ultimate inquiry in this regard, therefore, concerns whether or not the carrier is entitled to the benefit of one or more of the exemptions from responsibility provided in the Act. Thus, the ship's right to recover general average contribution from cargo in this case presents precisely the same question as would be involved if cargo were herein seeking to hold the ship liable for damage to cargo's goods
 Cia. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., 274 F.Supp. at 901-902. And see Gilmore & Black, supra, 5-13.
 
 
 [18]
 These expenses may be broken down as follows:
 Unloading $ 62,582.01
Inspection 1,123.40
Fumigation 9,329.00
Storage 26,895.56
Reshipment 513.00
 -----------
 $100,442.97
 
 
 [19]
 The cargo was delivered on February 11, 1957. On October 28, 1958, the salvage award became final. On March 16, 1959, the owner of the cargo filed a libel to recover its portion of the salvage paid
 
 
 [20]
 After the Orient Transporter arrived in Beaumont on August 7, 1970, its cargo was attached by a United States Marshal pursuant to an action in rem for salvage brought by the owners of the tug boat that towed the ship back to Beaumont. The United States Department of Agriculture undertook for the Government of Vietnam to bear responsibility for the amount of the salvage award, and the seizure was lifted. Through its agency, the Commodity Credit Corporation, the Agriculture Department oversaw and financed the unloading, fumigation, inspection and storage of the rice, and arranged for another charter so that the cargo would ultimately reach its destination. By March 31, 1971, the Government of Vietnam had reimbursed the Agriculture Department for all of these expenses. The Government of Vietnam also paid 90 percent of the freight to the Commodity Credit Corporation on February 2, 1971