NATIONAL SUGAR REFINING
COMPANY
v.
The MOTORSHIP LAS VILLAS.
No. 4080, Division "C".

United States District Court
E. D. Louisiana,
New Orleans Division.
Jan. 23, 1964.

Rene S. Paysse, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

John Poitevent, Trial Atty., George W. Healy, III, James B. Kemp, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

WEST, District Judge.

National Sugar Refining Company brings this action *in rem* against the Motorship LAS VILLAS to recover for damages to a portion of a cargo of raw

sugar shipped on the LAS VILLAS from Caibarien, Cuba to New Orleans, Louisiana. Libelant contends that the damage was caused by the unseaworthiness of the LAS VILLAS, and that the vessel is liable in damages because of a failure of its owner and claimant, Compania de Navegacion Dalpha, S. A., to exercise due diligence to make the vessel seaworthy and thus avoid damage to her cargo. Respondent defends on the ground that the unseaworthiness which caused the damage resulted from a latent defect in the vessel which was not discoverable by due diligence, and that hence neither the vessel nor its claimant are liable therefor. The case was submitted to the Court on depositions, stipulations of fact, and briefs filed by proctors for both sides. Now, after due consideration of the record thus presented, the Court is of the opinion that libelant cannot prevail herein, and in connection with this opinion, makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Pursuant to a contract of carriage, which incorporated in its Bill of Lading the provisions of the Carriage of Goods by Sea Act of the United States, 32,552 bags of Cuban centrifugal sugar were delivered aboard the Motorship LAS VILLAS at Cayo Frances, Caibarien, Cuba, between July 27, 1959, and August 4, 1959. This cargo of sugar was destined for delivery to libelant, the owner thereof, at New Orleans, Louisiana.

2. The loading of the sugar aboard the vessel LAS VILLAS commenced on Monday, July 27, 1959, and by Friday, July 31, 1959, over one-half of the ship's cargo had been loaded aboard the vessel. During these loading operations, and at the time water was first discovered in the No. 2 hold, portside, the vessel had taken on a slight (4°) list to port.

3. Prior to commencement of loading operations the ship's holds and bilges were thoroughly inspected, and soundings were taken to determine whether or not any excessive water was present in the bilges. No water was found in the holds, and no excessive water was found in the bilges. Everything was found to be shipshape. Similar inspections and soundings were taken each morning and afternoon during loading, and no unusual or abnormal conditions were found to exist until the sounding was taken at 7:00 o'clock a. m. on Friday, July 31, 1959. While it is normal to find one-half to two inches of water in the bilges, the sounding taken at 7:00 o'clock a. m. on Friday, July 31, 1959, revealed thirty inches of water at the No. 2 portside hold as compared with one-half inch of water on the starboard side. Eighteen inches of the water was in the bilge, leaving twelve inches of water actually in the No. 2 hold on the portside. By this time, over half of the ship's cargo had been loaded aboard, and upon finding the water in the No. 2 hold, portside, where sugar had been and was being loaded, loading operations were suspended.

4. Upon discovering the water in the No. 2 hold, a call was immediately made by the ship's captain for a survey by the American Bureau of Shipping. While waiting for this survey, which was made on Sunday, August 2, 1959, the ship's Chief Engineer made his own investigation and found that the No. 2 hold's port bilge suction valve was defective and was, even when turned off, allowing water to flow from the sea, through the valve, and into the No. 2 hold's port bilge. This condition was probably somewhat accentuated by the slight list to port incurred during loading. When functioning properly, this valve should allow water to be pumped out of the bilge but, when turned off, should act as a check valve to prevent water from flowing inward.

5. No repair was made on the valve until it was surveyed by a marine surveyor, Salvador Norman, who is accredited by the American Bureau of Shipping. This survey revealed that the vessel's hull was not leaking, and that the water was in the hold due to the defective condition of the suction valve.

6. There was no way that a visual or manual inspection of the valve, short of

actually dismantling the valve itself, could disclose or reveal the defect in the valve.

7. After dismantling the valve it was discovered that the valve's stem, stopper and guide were improperly fitted and/or designed and that the valve was thus defective. Repairs were made to the valve, which thereafter functioned properly.

8. Loading was then resumed and the vessel sailed on August 4, 1959, at 1224 hours for New Orleans, Louisiana, arriving there at 1056 hours on August 6, 1959.

9. When the cargo was unloaded at New Orleans, Louisiana, it was discovered that 523 bags of the sugar cargo in the No. 2 hold, portside, had been damaged by water, after being received aboard the vessel, and by stipulation of counsel, the amount of the damage to the sugar was determined to be $1,829.32.

10. The damage to this sugar was caused solely and entirely by the defective condition of the suction valve in question, which improperly allowed sea water to enter the No. 2 portside hold.

11. The Motorship LAS VILLAS was a new ship, having been built by the Atlantic Shipbuilding Co., Ltd., in Newport, Normanshire, England, in 1959. She was delivered to her owner, Compania de Navegacion Dalpha, S. A., on April 2, 1959, and her master took delivery of her on that date along with all certificates issued by the American Bureau of Shipping. Her maiden voyage commenced on April 27, 1959, and prior to her arrival at Caibarien, Cuba, she had sailed from Boston, Massachusetts, in ballast. None of her cargo holds had ever flooded prior to the incident giving rise to this litigation.

## CONCLUSIONS OF LAW

1. This suit, being a claim for cargo damage, is within the admiralty and maritime jurisdiction of this Court. 28 U.S.C.A. § 1333.

2. The cargo damage giving rise to this litigation arose out of a contract of carriage which incorporated in the Bill of Lading the provisions of the Carriage of Goods by Sea Act of the United States. 46 U.S.C.A. § 1300 et seq.

3. The provisions of the Carriage of Goods by Sea Act pertinent to this litigation are as follows:

46 U.S.C.A. § 1303: "(1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

"(a) Make the ship seaworthy;

"(b) Properly man, equip, and supply the ship;

"(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation."

46 U.S.C.A. § 1304: "(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\*    \*    \*    \*    \*    \*

"(p) Latent defects not discoverable by due diligence; \* \* \*."

4. Since the cargo of sugar was received aboard the Motorship LAS VILLAS in good condition, and since part of the cargo was delivered at its destination in a damaged condition, and since the damage to the cargo was admittedly

caused by the unseaworthy condition of the vessel, at the time of loading, the burden is upon the carrier or the claimant of the vessel who seeks to be exempt from liability to prove the exercise of due diligence to make the ship seaworthy, or to prove that the unseaworthiness was caused by a latent defect not discoverable by the exercise of due diligence. 46 U.S. C.A. § 1304; Orient Insurance Company v. Flota Mercante Del Estado, 102 F. Supp. 729 (E.D.La.1951), aff. 198 F.2d 740 (CA 5 1952).

5. A latent defect is a defect which is not apparent and which would not be discoverable upon reasonable inspection. It may be a defect in design or a defect in the material used to make or fabricate an object. In this case, improper design was used in the manufacture of the suction valve involved. The improper design was not apparent upon visual inspection, nor was it discoverable by any reasonable inspection that might have been performed. This faulty design, which caused the malfunctioning of the valve was a latent defect not discoverable by due diligence. Sociedad Armadora A. P. v. 5,020 Long Tons of Raw Sugar, 122 F.Supp. 892 (E.D.Pa.1954), aff. 223 F.2d 417 (CA 3 1955); The Quarrington Court, 122 F.2d 266 (CA 2 1941).

6. The Court finds, as a matter of law, that due diligence was exercised by the operators of the LAS VILLAS to make her seaworthy. Due diligence to make a vessel seaworthy is that which would or should be exercised by a reasonably competent vessel owner. The Bill, 47 F.Supp. 969 (D.Md.1942), aff. Lorentzen v. Brazil Oiticica, 145 F.2d 470 (CA 4 1944). Such diligence has here been proved. Inspections, including visual inspection and soundings of the holds and bilges were conducted prior to, during and after the loading operations. Everything possible was done, short of actually dismantling the valve itself, to be sure that the vessel was ready to receive cargo and to be sure that she was at all times in a seaworthy condition. It was not until a purely latent defect suddenly manifested itself that the unseaworthy condition was discoverable. By the time this occurred, the damage had been done.

7. Due diligence, as required by law, having been exercised at all times by the operators of the Motorship LAS VILLAS, and the damage to the cargo having been caused solely and entirely by a latent defect not discoverable by due diligence, the Motorship LAS VILLAS and her claimant are relieved of liability for the cargo damage. 46 U.S.C.A. § 1304.

Judgment will be rendered accordingly.