**TODD SHIPYARDS CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**No. 71 Civ. 2842–LFM.**

United States District Court,
S. D. New York.

March 21, 1975.

Crowell, Rouse & Varian, New York City, for plaintiff, Richard A. Hagen and George L. Varian, New York City, of counsel.

Paul J. Curran, U. S. Atty., S. D. N. Y., for defendant, Gilbert S. Fleischer

and Janis G. Schulmeisters, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

The S.S. RICHWOOD, loaded with government cargo, left Oakland, California on June 10, 1969 bound for Da Nang, South Vietnam. During the voyage, her master called for tug assistance and she was towed approximately 1,000 miles to Yokohama, Japan. Plaintiff's assignor, Richwood Steamship Company ("Richwood"), the owner of the vessel, declared a general average based on the incident. A general and particular average statement was issued by the adjuster assessing the government's proportion of the general average at $35,717.27. The amount of the salvage award was submitted to arbitration, and the arbitrators determined that the government was liable for $85,000. The government has paid its share of the arbitration award but refuses to contribute to the general average.

In this action, tried to the court without a jury, plaintiff seeks contribution to the general average from the government, as owner of the cargo.

In June 1968, the government, through the Military Sea Transportation Service, contracted for ocean transportation with Columbia Steamship Company ("Columbia"). The contract was renewed and was in force at the time of the incident. Richwood chartered the S.S. RICHWOOD to Columbia in February 1969, and the charter was in effect during the voyage in question. In October 1968, Richwood assigned to plaintiff, among other things, all future claims for general average. Plaintiff sues as Richwood's assignee.

Plaintiff contends that the vessel was in peril, that a general average event did occur and that the government is liable for its share. The government contends that a general average event did not occur since the vessel was never in peril.

Prior to departing Oakland, California, the S.S. RICHWOOD was loaded with cargo, including deck cargo, and the government supplied the vessel with a cargo plan. At that time, Richwood's port captain, Hopkins; the vessel's master, Morrissey; and the chief mate, Horne, calculated the vessel's metacentric height ("G.M.").[1]

There is a dispute as to which cargo plan was used in the G.M. calculations. Plaintiff contends that the calculations were based upon the cargo plan supplied by the government. The government, however, contends that the calculations were not based upon its cargo plan but upon information supplied by Columbia. In any event, the G.M. was calculated by Captain Morrissey, Chief Mate Horne, and Port Captain Hopkins as 2.0 feet. Columbia also calculated the vessel's G.M. and arrived at a figure of 2.9 feet.

[1]. G.M. is based upon mathematical calculations which determine the distance between the vessel's center of gravity and her metacenter. It indicates the vessel's stability or her tendency to return to an upright position after inclination. Crucial to this computation is a knowledge of the placement and weight of all cargo on board. Such a calculation should be corrected for free surface, a condition which exists when a liquid on board a vessel is free to move in its tank or compartment. Free surface causes a virtual rise in the ship's center of gravity and thus affects her G.M. See J. La Sage and L. Van Gemert, *Stability and Trim for the Ship's Officer* (2d ed. 1972).

Basically, if a vessel has a positive G.M., she will tend to right herself if inclined to a small angle. The greater this positive G.M., the more rapidly the vessel will return to an erect position. If this value becomes too large for a particular vessel, the vessel becomes "stiff," tending to right herself too rapidly. As the G.M. approaches zero, the vessel becomes "tender." The time it takes for the vessel to right herself increases until, with a G.M. of zero, the vessel is in "neutral equilibrium." In such a state, an inclined vessel tends neither to right herself nor to continue her inclination once the inclining force is removed. As the G.M. takes on a negative value, the vessel becomes "unstable." An unstable vessel does not tend to return to the upright when inclined. Rather, for small angles, she tends to continue to incline even after the inclining force is removed. See J. La Sage and L. Van Gemert, *Stability and Trim for the Ship's Officer, supra.*

It appears that these calculations were not corrected for free surface.

It is undisputed that, as the vessel was preparing to leave the dock, she was listing about 3° or 4° to starboard. Captain Morrissey, Chief Mate Horne, and Port Captain Hopkins attributed this list to unevenly distributed weights and sailed despite the list. By the time the S.S. RICHWOOD reached open sea, the list had increased to 7°; nevertheless, the voyage was continued.

En route to Vietnam, the vessel continued to list and alternately flopped from port to starboard, listing on each side as she did so. On June 18, 1969, the weather began to worsen and so did the list. The list became as bad as 16° and the vessel continued to flop. On June 24, 1969, the vessel's engines were stopped after the chief engineer advised Captain Morrissey that the boilers had been rendered inoperable by the flopping of the vessel, and she was towed about 1,000 miles to Yokohama, Japan.

Upon arrival in Yokohama, 165 tons of deck cargo were removed from the vessel to decrease her list and draft so as to permit entry into a shipyard. Once in the shipyard, deadweight surveys, G.M. calculations, and an inclining experiment were conducted, all of which indicated that the vessel, as she was fully loaded, was unstable, having a negative G.M.

The S.S. RICHWOOD's boilers were examined in the shipyard, and it was determined that they suffered only minor damage and that the vessel was capable of continuing the voyage. After minor repairs, the vessel continued the voyage to Da Nang without incident, absent 165 tons of deck cargo discharged at Yokohama.

■■ It is true that "there must be fair reason to regard a vessel in peril in order to require a contribution in general average."[2] To be in peril, however, danger need not be immediately impending but can be distant or unlikely as long as it is real and substantial.[3] In such a case, an expenditure in good faith and in the common interest is justified.[4]

■ The S.S. RICHWOOD was without power in the Pacific Ocean, flopping from side to side to lists as great as 16°. It was the judgment of the chief engineer that power could not be restored. The captain, acting in good faith and relying upon that advice, justifiably concluded that the vessel was in danger and decisively called for a tow to remove the vessel from this perilous situation. It is not for us, situated far from the dangers of the sea, to second-guess this decision. The captain acted prudently and no further harm befell the vessel or her cargo.

It is of no moment that the engines, upon inspection in a safe port, were judged capable of simple repair or that the engineer may have mishandled the situation. The vessel's captain acted upon the information available to him at the time, and it is not for us to hold, with the wisdom of flawless hindsight, that he should have waited for the situation to worsen, for the list to increase, or for the weather to deteriorate before considering the vessel in peril. Such a holding would sanction putting lives in imminent danger. Moreover, had the captain waited for the situation to worsen, it may have been too late. The difficulty of attaching tow lines to a listing vessel in heavy seas and towing the vessel 1,000 miles may have been so great as to render rescue attempts futile. We find, therefore, that the vessel was undoubtedly in peril.

2. Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc., 92 F.2d 41, 43 (2d Cir.), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937); United States v. Wessel, Duval & Co., 123 F.Supp. 318, 328 (S.D. N.Y.1954).

3. *Id.*

4. *Id.*

We turn now to the question of whether the government must contribute to the general average.

The shipping agreement between the government and Columbia contains a standard Amended Jason clause. It provides as follows:

"In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if such salving vessel or vessels belonged to strangers."

Plaintiff claims that under this clause it is entitled to a contribution to general average. The government argues that plaintiff cannot claim the benefit of this clause because plaintiff was not a party to the shipping agreement. We find, however, that plaintiff cannot recover whether or not it can invoke the clause.

The Amended Jason clause has been interpreted in conjunction with the Carriage of Goods by Sea Act [5] to permit a carrier to recover in general average, even if the vessel was unseaworthy, provided the carrier exercised due diligence to make the vessel seaworthy at the commencement of the voyage.[6]

It is undisputed that the S.S. RICHWOOD was unseaworthy at the commencement of the voyage because of her unstable condition and that the unseaworthiness was the proximate cause of the vessel's peril. Once it has been established that a vessel is unseaworthy, the burden is upon the carrier to prove that this condition existed despite due diligence on its part.[7]

Horne, the chief mate, and George Bacalakis, Richwood's president, when deposed, both testified that the government supplied the vessel with a smooth or final cargo plan containing the weights and locations of substantially all the cargo loaded on the vessel. Captain Morrissey, however, in a statement prepared upon arrival in Yokohama and in a letter to the president of Columbia, stated that his calculation of a 2.0 foot G.M. was based not upon the government's cargo plan but upon cargo weights supplied by Columbia. Chief Mate Horne, also in a statement made soon after the vessel arrived in Yokohama, stated too that his calculations of a 2.0 foot G.M. was based on a plan supplied by Columbia. Richwood's port captain, Hopkins, in a similar statement, likewise claimed to have computed a 2.0 foot G.M. on the basis of Columbia's plan.

In these same statements, Captain Morrissey and Chief Mate Horne admitted that their calculations were not corrected for free surface, and Captain Morrissey termed this a "mistake" since a vessel of the S.S. RICHWOOD's size usually had quite a large amount of free surface. A correction for free surface would have reduced the calculated G.M. of an already tender vessel and may

5. 46 U.S.C. §§ 1300–1315.

6. Orient Mid-East Lines, Inc. v. A Shipment of Rice, 496 F.2d 1032 (5th Cir. 1974); Isbrandtsen Co. v. Federal Ins. Co., 113 F.Supp. 357 (S.D.N.Y.1952), aff'd on opinion below, 205 F.2d 679 (2d Cir.), cert. denied, 346 U.S. 866, 74 S.Ct. 106, 98 L.Ed. 377 (1953). See also, The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912); Schade v. National Surety Corp., 288 F.2d 106 (2d Cir. 1961); Director General of India Supply Mission v. S.S. Janet Quinn, 335 F.Supp. 1329 (S.D.N.Y.1971); American Tobacco Co. v. Goulandris, 173 F.Supp. 140 (S.D. N.Y.1959), aff'd, 281 F.2d 179 (2d Cir. 1960).

7. Orient Mid-East Lines, Inc. v. A Shipment of Rice, supra, 496 F.2d at 1038; Peter Paul, Inc. v. Rederi A/B Pulp, 258 F.2d 901, 905 n. 2 (2d Cir. 1958), cert. denied, 359 U.S. 910, 79 S.Ct. 586, 3 L.Ed.2d 574 (1959); American Tobacco Co. v. Goulandris, supra, 173 F.Supp. at 168.

have indicated that the vessel was indeed unstable or would likely become unstable as fuel and water were consumed.

While at the dock, the 3°–4° list of the vessel caused some concern among the vessel's officers and Port Captain Hopkins, but they attributed it to an uneven distribution of cargo, and Captain Morrissey believed that this situation might have been aggravated by slack tanks. However, rather than taking corrective measures or recalculating the G.M. with a correction for free surface due to slack tanks, the situation was merely discussed and apparently ignored.

Although there was some concern over the accuracy of the cargo plan supplied by Columbia and the G.M. calculations based upon it, little effort was made to determine its correctness. Columbia's personnel were questioned as to the accuracy of the plan, and upon Columbia's assurance that the vessel had a 2.9 foot G.M. and, according to Horne, Columbia's threat to take the vessel off charter if the matter were pursued further, the matter was dropped and the vessel sailed.

By the time the vessel reached open sea, her list had increased to about 7°; yet this danger signal was not heeded by the captain and the voyage continued. In an effort to trim the vessel, the captain ordered the chief engineer to take soundings continually of all of the vessel's tanks to ensure that they were always "pressed up," i. e., without any free surface. Subsequently, Captain Morrissey and the general average adjuster concluded that the chief engineer mishandled the transfer of liquids in the tanks and that, rather than stabilizing the vessel, he actually increased her free surface causing stability to deteriorate.

It is clear from the above events that the captain did not exercise due diligence to ensure the seaworthiness of the vessel before she put to sea. The vessel's list and the master's doubt as to the accuracy of the cargo plan supplied by Columbia put the accuracy of the stability calculations in question. The captain surely had a duty to pursue the matter further. He could have checked the figures on Columbia's plan against the cargo on board the vessel. He could have compared that plan with the one supplied by the government to see if any discrepancy existed and, if so, determine the cause.

Moreover, basic texts on ship stability emphasize the importance of correcting G.M. calculations for free surface, and testimony at trial indicates that this is critical. Captain Morrissey's failure to make such a correction on a vessel of this size, especially in light of her list and the doubts as to the accuracy of the stability calculation, is inexcusable.

We find that plaintiff has not met its burden of proving that Richwood acted diligently. The vessel's instability was directly attributable to a lack of due diligence on the part of her owner and her master, and not the result of any fault on the part of the government. Accordingly, if the Amended Jason clause applies, as plaintiff contends, it is barred from recovering contribution to the general average.

If, as the government contends, plaintiff cannot claim the benefits of the Amended Jason clause, the case against plaintiff's recovery is even stronger. If that clause is inapplicable, the case is "controlled by the traditional rule that the ship at fault has no right to general average contribution." [8]

It is clear that it was through the fault of the master and crew that the vessel came into peril. Their fault is evidenced not only by their failure to exercise due diligence to ensure that the vessel was seaworthy as she left the dock, but also by their acts thereafter.

By the time the vessel had entered open water, her list had increased to 7°; yet the master did not return to port to rectify the situation. Nor did he even halt the vessel and attempt to reduce the list before proceeding further out to sea. He acted negligently by not taking

8. J. Howard Smith, Inc. v. S.S. Maranon, 501 F.2d 1275, 1279 (2d Cir. 1974). See The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130 (1898).

corrective action once he was put on clear notice of a dangerous situation by an increasingly listing vessel.

Furthermore, the evidence indicates that the crew, especially the chief engineer, completely mishandled the worsening situation as the vessel continued on the voyage and eventually encountered bad weather. He mishandled the tanks, thereby creating more free surface and further reducing the vessel's stability. He then stopped the engines necessitating the tow. The general average adjuster found that he misinterpreted the engines' malfunction and that it may have been possible to repair the engines at sea. The vessel, therefore, was clearly at fault.

We conclude, therefore, that whether or not the Amended Jason clause is applicable here, the vessel cannot recover contribution to general average.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R.Civ.P.

Accordingly, the Clerk of the court is directed to enter judgment in favor of defendant dismissing the complaint.

So ordered.