BUBBLE UP INTERNATIONAL LTD., Pakistan Beverage Company, Clinton Milling Company, Masir Abdulla Al Schagawi, Seaboard Commodities Inc., J. M. Al-Mahaidib, Fahad & Omar Alateig-Al-Ahsa, Riviana Foods Inc., Saeed Ahmed Al-Mahroos, Mohamed & Abdulla Alsulaiman Alsaadi, the Alliance Milling Co., Uncle Ben's, Inc., General Trading Company, McMaster Car Supply Gresham Linley Ltd., Tube Turns Division of Chemetron Corp., Kuwait Oil Fields Supply Co., Rockwell Manufacturing Co., S.A., Alfarsi, Kuwait Oil Co. Ltd., United Export Clothing Co. Inc., Haji Ferman, Haji Zahid, Spahi & Nazar Jan, Toor Khan, Singer Products Co. Inc., Associated Batteries Co. Ltd. and Lloyd's Underwriters and Insurance Companies, Plaintiffs,

v.

TRANSPACIFIC CARRIERS CORP. and Hellenic Lines Ltd., Defendants.

No. 74 Civ. 5477 (VLB).

United States District Court,
S. D. New York.

Sept. 29, 1978.

Bigham, Englar, Jones & Houston, New York City, for plaintiffs.

Burlingham Underwood & Lord, New York City, for defendants.

### OPINION

VINCENT L. BRODERICK, District Judge.

### I.

Plaintiffs Bubble Up International Ltd., et al., owners of cargo carried upon defendants' ship, bring this action to recover General Average deposits required by and paid to defendants as a prerequisite for the release of plaintiffs' cargo at ports of discharge.

Admiralty and maritime jurisdiction is properly invoked pursuant to 28 U.S.C. § 1333 and Rule 9(h), F.R.Civ.P.

I find, for the reasons set forth below, that plaintiffs are entitled to recover the amounts they paid as General Average.

### II.

Plaintiffs are the owners or underwriters of certain cargoes which were loaded aboard the freighter "Hellenic Glory" in various United States ports for carriage to foreign ports of discharge. "Hellenic Glory" is owned by defendant Transpacific Carriers Corp., a subsidiary of defendant Hellenic Lines Ltd., operator of the vessel.

During December of 1971 and January of 1972, the "Hellenic Glory" took on plaintiffs' cargoes at various U.S. east coast and gulf coast ports for transport to ports in the Persian Gulf, India and Pakistan. With respect to all such cargoes, defendants issued bills of lading, each of which set forth the terms and conditions of the contract of carriage as between the shipper and the operator of the vessel. Each bill of lading contained, either in fact or through incorporation by reference, Clause 11, commonly referred to as the "new Jason Clause"[1] (hereafter "the Jason Clause").

On February 1, 1972, shortly following her departure from her last United States loading port, "Hellenic Glory" sustained an engine failure which left the vessel powerless upon the high seas. The owner caused

---

1. "In case of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatever, whether due to negligence or not for which, or for the consequences of which, the carrier is not responsible by statute, contract or otherwise, the goods, their owners or shippers shall contribute with the carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect to the goods. * * * General Average shall be adjusted, stated and settled in any port or place elected by the carrier and according to York/Antwerp Rules 1950, except Rule 22 thereof. The General Average statement in every instance shall be prepared by average adjustors selected by the carrier. * * * Such deposit, agreement or other security as the carrier or his agents may consider requisite to cover the estimated contribution of the goods and any salvage and special charges thereon shall be made by the goods or shippers to the carrier, if required, before delivery."

the vessel to be towed into New York Harbor, where it was delivered on February 23, 1972. Repairs were carried out; a survey was conducted to ascertain the cause of the machinery failure; and the vessel resumed her interrupted voyage on March 20, 1972.

As a consequence of the engine breakdown and the costs incurred in having the vessel towed and repaired, the vessel owners declared a General Average pursuant to the Jason Clause, and collected from the cargo interests, prior to or at the time of delivery of the cargo at the ports of destination, deposits covering their respective estimated shares of General Average. These deposits with respect to cargos owned or underwritten by plaintiffs totalled $7,128.17.[2] Discharge of the cargo loaded in United States ports was completed at the final discharge port on June 30, 1972.

General Average is a principle long recognized by the general maritime law and embodies the concept that a sacrifice made for the common benefit which is incurred by one who partakes in a maritime venture should be shared proportionately by all who participate in the venture and benefit as a result of the sacrifice. See generally: Buglass, *Maritime Insurance and General Average in the U.S.*, 12022 (1973); Gilmore and Black, *The Law of Admiralty*, 2d Ed., 244–71 (1975). Initially the sacrifice incurred by the common benefit of vessel and cargo is paid by the vessel owner, who must save his vessel if the cargo aboard is also to be saved. Thereafter the vessel owner arranges for a General Average Statement to be drawn up and prepared.

Pending determination and issuance of the final General Average adjustment, the ship has "a lien upon the cargo for such contributory share as, under the facts of the case, the cargo owners might be bound to pay . . . ." *Agathe*, 71 F. 528, 530 (S.D.Ala.1895). As a practical matter, the carrier is usually satisfied to accept upon delivery of the cargo an undertaking given by one who might be liable to pay such contribution as might be found owed by him. Alternatively, a cash deposit may be collected by the carrier's agent as a condition precedent to release of the cargo, and held in trust pending resolution of challenges to the General Average. Such deposits were collected in this case.

The actual work in preparing the adjustment, or "Statement of General Average", is performed by the "adjustor" who is selected and hired by the vessel owner. The adjustor investigates the entire course of events on the basis of which the General Average contribution is claimed and allocates charges and expenses to cargo owners in proportion to their cargo on the ship when the damage occurred.

However, the adjustor does not resolve any challenges to the ship owner's right to General Average contributions. That task is now before me, pursuant to the admiralty and maritime jurisdiction of the district courts.

On January 30, 1973, a Statement of General and Particular Average[3] (hereinafter the "General Average Statement"), was issued at New York, New York, by the designated General Average adjustor, Fred S. James & Co. of N. Y., Inc. The adjustor fully described the circumstances and expenses constituting the General Average.

The General Average Statement reproduced reports by the vessel owner, those involved in towing and repairs, and testing laboratories for interested underwriters. The statement also included log extracts, the Vessel Masters' Report, and a Certificate of Valuation. It attributed charges and expenses to cargo owners, plaintiffs among them, modifying and reiterating the General Average contributions required of the cargo interests.

In the narrative at the beginning of the General Average Statement, the adjustor reported that the engine failure of the

2. These monies received by Hellenic are being held in trust by Hellenic pending final settlement of this General Average dispute as per the terms of the Jason Clause.

3. Statement of General and Particular Average on Transpacific Carriers Corporation S.S. "Hellenic Glory", Report Despard International No. 12–72–4.

"Hellenic Glory" was caused by crew negligence on a prior journey:

> This damage is attributed to crew negligence on August 16th, 1971 in not properly fitting the split pin in the front bolt after opening up the No. 4 bearing for examination which has been agreed to by Underwriters Surveyors.

The General Average Statement set forth that slackness resulting from the absence of the pin had the effect of increasing the bending load and stress on the port side bolt of the No. 4 bottom end bearing which ultimately failed and which, in turn, caused the starboard side bolt to fail. The failure of the No. 4 bearing and the damage caused to the main engine as a result thereof rendered the vessel unable to move under its own power.

### III.

In December, 1974, plaintiffs commenced this suit for recovery of the General Average deposits.[4] Plaintiffs argue that defendants are not entitled to General Average contributions for the losses suffered because of the engine failure. Defendants allege that General Average treatment is appropriate here as within the terms of the Jason Clause.

■ The Jason Clause itself does not resolve this issue, but refers to statutory or contract provisions. Since the cargoes involved herein were loaded at various U.S. ports for transport in foreign commerce, The Carriage of Goods By Sea Act (hereinafter "COGSA"), 46 U.S.C. §§ 1300, *et seq.* (1936)[5] is incorporated into each bill of lading by reference and, for purposes of this suit, it is the statute which is referred to in the Jason Clause.

The effect of the combination of the new Jason Clause and the Carriage of Goods by Sea Act is that once a general average act within 'traditional bounds' is established, cargo will be required to contribute in general average even if the general average loss is due to a cause, . . attributable as negligence to the carrier, if it is determined that the carrier would not be responsible to cargo under the Act for loss resulting from such cause. The ultimate inquiry in this regard, therefore, concerns whether or not the carrier is entitled to the benefit of one or more of the exemptions from responsibility provided in the Act. Thus, the ship's right to recover general average contribution from cargo in this case presents precisely the same question as would be involved if cargo were herein seeking to hold the ship liable for damage to cargo's goods. (citations omitted).

*Orient Mid-East Lines, Inc. v. A Shipment of Rice,* 496 F.2d 1032, 1041 n.17 (5th Cir. 1974).

---

4. Although the statute of limitations under The Carriage of Goods by Sea Act (hereinafter "COGSA") is one year from date of delivery of cargo, 46 U.S.C. § 1303(6), the COGSA statute of limitations does not apply to actions to recover salvage or General Average deposits; such actions are construed as actions for indemnity, not actions for loss or damage under section 1303(6). *Orient Mid-East Lines; Inc. v. A Shipment of Rice,* 496 F.2d 1032, 1042 (5th Cir. 1974). *See also Cerro Sales Corp. v. Atlantic Marine Enterprises; Inc.,* 403 F.Supp. 562, 566 (S.D.N.Y.1975). Therefore, plaintiffs' claim is not time-barred.

5. *Section 1303*
   (1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—
   (a) Make the ship seaworthy;

   \*   \*   \*   \*   \*   \*

*Section 1304*
(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, . . . in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.
(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

   \*   \*   \*   \*   \*   \*

(p) Latent defects not discoverable by due diligence;

■ It is undisputed that the engine damage which precipitated the General Average was the result of crew negligence in Capetown, South Africa on August 16, 1971, in failing to replace a split, or cotter, pin (hereafter "cotter pin") in a bearing bolt inside the engine. Defendant's Post Trial Brief filed February 15, 1977, at pp. 2–3. Under Section 1304(2)(a) of COGSA, defendants are not liable for damages resulting from crew negligence. However, the engine failure occurred not between Capetown and New York on the voyage where the crew negligence occurred, but on a succeeding voyage after the "Hellenic Glory" had been in U.S. ports and had been subjected to inspection by defendants. Thus the specific issue in this case is whether defendants are liable under COGSA for the continuing condition of the absent cotter pin,[6] not on the voyage from Capetown to New York, but on the subsequent voyage from the United States. Was there intervening negligence on the part of the owners in failing to correct the crew's mistake?

■ Under COGSA, Section 1303(1)(a), defendants are bound to exercise due diligence to make the ship seaworthy and to discover latent defects.

[T]he term 'seaworthy' is a relative one, . . . . In general, a ship must be sufficiently strong and staunch and equipped with the appropriate appurtenances to allow it to safely engage in the trade for which it was intended.

*Texaco, Inc. v. Universal Marine, Inc.,* 400 F.Supp. 311, 320 (E.D.La.1975). The "Hellenic Glory" was indeed "unseaworthy" on the voyage in issue; the absence of a cotter pin which is vital to the proper functioning of the engine requires the conclusion that the ship was unseaworthy when it left port.

■ Once it has been established that a vessel is unseaworthy, under COGSA, Section 1304(1), "the burden is upon the carrier to prove that this condition existed despite due diligence on its part." *Todd Shipyards Corp. v. United States,* 391 F.Supp. 588, 591 (S.D.N.Y.1975). *See also Peter Paul, Inc. v. Rederi A/B Pulp,* 258 F.2d 901, 905 n.2 (2d Cir. 1958); *Asiatic Petroleum Corp. v. S.S. American Trader,* 354 F.Supp. 389 (S.D.N.Y. 1973). The burden is thus on defendants to prove the applicability of Section 1304(2)(p) of COGSA, i. e., that the absence of the cotter pin was a latent defect not discoverable by due diligence. *See Margarine Verkaufsunion G.m.B.H. v. M.T.G.C. Brovig,* 318 F.Supp. 977, 980 (S.D.N.Y.1970); *see also National Sugar Refining Co. v. Motorship Las Villas,* 225 F.Supp. 686, 689 (E.D. La.1964), "A latent defect is a defect which is not apparent and which would not be discoverable upon reasonable inspection." And in applying the burden of proof, the

---

**6.** The purpose of a cotter pin is to keep the nut on the bolt; it is not designed to keep the nut tight on the bolt. This distinction is important to defendants because, as discussed *infra*, the hammer test relied upon by defendants to establish due diligence is designed to discover loose nuts and bolts, not missing cotter pins.

The General Average statement reproduced damage reports from various sources. According to the New York Testing Laboratories, Inc. Report of Metallurgist (hereinafter "New York Lab"), the failure of the bolt commenced shortly after the August 16th date and occurred over a long period of time. The New York Lab found that "the only possibility is that the nut on the short bolt section end had not been properly hardened up and restrained and had loosened progressively. This action thereafter resulted in increasing bending stresses, ending in ultimate failure of both bolts.

If I accept the finding of the New York Lab, I must conclude that the bolt was loose when the ship was in the United States ports. If that is

so, defendants will not be able successfully to contend that the routine "hammer test" upon which they rely to establish "due diligence" was performed or was performed properly. The inescapable result would be a finding that defendants did not use due diligence to make the ship seaworthy as required by COGSA.

However, our inquiry must continue, because the report of the New York Lab is not uncontested. The Survey Report of British Underwriters Representatives explicitly disagreed with New York Lab and found that "slackening of the suspect nut and failure of the opposite bolt due bending would have taken place within a very short period of time. . . . ."

Thus it is possible that the nut was not loose on the bolt when the hammer test presumably was performed in New Orleans, despite the absence of a cotter pin. For this reason, I shall consider whether or not defendants met the due diligence requirement of COGSA in light of an absent cotter pin, not a loose nut or bolt.

exercise of "due diligence" is construed against the carrier upon whose warranty shippers rely:

> . . . [T]he exception of due diligence is one strictly construed against the carrier warranting a seaworthy vessel. *Compagnie Maritime Francaise v. Meyer*, 9 Cir., 248 F. 881, 886. As Hand, L., Ct. J. observed in *Metropolitan Coal Co. v. Howard*, 2 Cir., 155 F.2d 780, 783, "the warranty of seaworthiness is a favorite of the admiralty and exceptions to it or limitations upon it, are narrowly scrutinized."

*Standard Oil Co. v. Anglo-Mexican Petroleum Corp.*, 112 F.Supp. 630, 637 (S.D.N.Y. 1953).

### IV.

Defendants contend that they did exercise due diligence to make the ship seaworthy per Section 1304(1) of COGSA. Although there is no evidence that any tests for seaworthiness were actually performed on the engines of "Hellenic Glory" prior to departure, defendants explain that a routine three part test is performed before a ship commences a voyage of more than 7–10 days and requests that I assume that this routine test was in fact performed in New Orleans prior to the "Hellenic Glory's" departure. I shall do so, and shall evaluate the "due diligence" of defendants under Section 1304(1) in light of the routine test. The factual absence of the cotter pin does not deter defendants from their assertion of due diligence; they argue that the lack of a cotter pin was a latent defect not discoverable by the due diligence required under Section 1304(2)(p). In other words, defendants allege that 1) the three-part routine test which I shall assume was performed prior to departure from New Orleans constitutes due diligence under Section 1304(1); and 2) the fact that this test did not reveal the absence of the cotter pin indicates that the absence was "not discoverable by due diligence" under Section 1304(2)(p).

Defendants' witness, Mr. Gerassimos Macris, who is a port engineer for Hellenic Lines, outlined the components of the test upon which defendants rely to establish due diligence.

When a vessel is about to depart on a voyage in excess of 7–10 days, the vessel's pistons, liners, piston rings, injectors, fuel pumps and things that are in continual operation and subject to wear are inspected. Also, a general inspection of the engine room and the engine itself, as far as possible, is carried out by the chief engineer, or under his supervision, to make sure that the ship is seaworthy before heading out on the voyage, in addition to making sure that any deficiencies he had observed during a prior sailing are put in order.

During the inspection of the engine room, the crankcase is examined. Generally the six inspection doors on one side of the crankcase are removed and three basic inspections or tests are conducted.

The first inspection is for any evidence of white metal chips on the bottom of the crankcase of each cylinder. A soft white metal in the bearings in each cylinder acts as a shock absorber, and thus if any white metal is found, it would indicate that one of the bearings is damaged.

For purposes of this first test, the inspector stands on the deck just outside the panel window and with a flash light as his light source, looks inside the panel window and checks the crankcase bottom. Normally, he would expect to see only residual sludge which has drained to the bottom of the crankcase as a result of the oil pump's being shut off for purposes of the overall inspection.

The second test is the "hammer test", in which the inspector checks the tightness of all the bolts and nuts in each cylinder. For purposes of this test, the inspector must enter the crankcase itself. While standing on a ledge just inside the panel window, which is 6 or 7 feet above the crankcase bottom, he hits with a hammer each bolt and nut within his reach. Upon striking a nut or bolt with a hammer, the inspector can tell whether the nut or bolt is tight or loose. The sound of a loose nut or bolt is distinctive and is readily apparent to the trained ear.

There are nuts and bolts in the crankcase which cannot be reached from the ledge inside the panel window. To hammer-test these bolts and nuts, the inspector must climb onto various components of the cylinder and while holding on to the engine with one hand, reach out with the other hand to hammer-test these remaining nuts and bolts.

Perhaps as many as 50 nuts and bolts are hammer-tested in each of six cylinder compartments. The test encompasses all things within the cylinder compartment which are subject to becoming slack, including the bolts that hold the engine block together on the walls between cylinder compartments. However, it is not an objective of this test to ascertain whether or not the cotter pin in each bolt is properly in place.

During this test, the inspector does not necessarily see the nuts or bolts. Yet in his knowledge of the placement of the parts of the cylinder, he is able to reach out and conduct the hammer test on these nuts and bolts. There is no independent light source within the cylinder compartment, and the inspector does not carry a flashlight: one hand holds the hammer and the other is used for bracing purposes. The source of light for this test is the artificial light coming from the engine room, perhaps augmented by light from a flashlight directed into the engine through the panel window by an assistant standing on the deck outside.

The third inspection is a visual one of oil circulation. It is conducted from outside the panel window. The inspector, using a flashlight as his source of light, looks inside the crankcase compartment to make sure that there is a sufficient quantity of oil flowing through the bearings and slippers of the cross-heads. During this inspection, a mechanical turning gear puts the engine through a complete rotation. Excessive oil coming out of any bearing would indicate that the clearance on the bearings is excessive.

After the third test is completed and assuming no adjustments or repairs to the engine are indicated, the panel doors are replaced and the engine is deemed ready for operation.

Defendants contend that this test constitutes due diligence under COGSA, even though the test did not and was not designed to check for a missing cotter pin, because it was the "normal" test done by defendants before an extended voyage. Defendants allege that "all the ship owner need establish is that normal precautions were taken. . . ." citing *Peter Paul, Inc. v. Rederi A/B Pulp, supra,* 258 F.2d at 905–6.

## V.

Defendants' characterization of their routine tests as "normal" and "customary" is not dispositive of the issue of due diligence. In *Peter Paul, Inc., supra,* the court spoke of *some* "normal" precautions to test for the condition in question, whereas defendants admit that their routine test entails no inspection for the presence or absence of cotter pins. In *The T. J. Hooper,* 60 F.2d 737, 740 (2d Cir. 1932), Judge L. Hand suggested that customary industry practice does not necessarily and by definition constitute "due diligence":

> [I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure . . . Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

The principle articulated in *The T. J. Hooper* has been consistently reaffirmed.

> [I]t is well settled that industry practice is not the universal measure of due diligence."

*Eaton v. L.I.R.R.,* 398 F.2d 738, 742 (2d Cir. 1968). *See also, In re Tug Ocean Prince, Inc. et al. v. United States,* 584 F.2d 1151 at 1156 (2d Cir. 1978), ("Methods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact."); *Mfrs. Hanover Trust Co. v. Alitalia Airlines,* 429 F.Supp. 964, 968 (S.D. N.Y.1977), *quoting The T. J. Hooper, supra.*

The rejection of custom as the control has also been recognized in cases brought under COGSA. *See, e. g., California & Hawaiian Sugar R. Corp. v. Winco Tankers, Inc.,* 278 F.Supp. 648, 654 (E.D.La.1968):

[I]t is important to observe that, just as in general tort law, doing what is customary does not of itself negate negligence.

Thus I must determine the parameters of the due diligence requirement in this case. [C]learly, wisdom born of the event cannot be the measure of due diligence, and the standard must be one of conduct rather than of consequences. At the other extreme, is the subjective standard of the honest though mistaken belief in good faith by the shipowner that no damage will result. Such individual gauge may suffice to relieve a conscience of moral blame, but not a pocketbook of liability for damage.

Between these poles is a standard external to the notions of the shipowner of what is proper and yet based upon conduct judged in the light of probabilities apparent to the shipowner at the time of welding or inspection rather than those perceptible only by backward glance. Under this standard the probability of damage ought to be sufficiently high to command general attention. And risk of that damage must be estimated in the light of knowledge which the shipowner had and ought to have had. What knowledge the shipowner had is simply a question of fact; what knowledge he ought to have had is one of value determined by law. The minimum knowledge that ought to be had by one without special training is (1) what would be apparent to most men of ordinary intelligence and experience who make use of their faculties; and (2) what would be discovered by the kind of investigation that a man of reasonable prudence would make. In addition to these, a shipowner with special training ought to know (1) what would be apparent to most men with such special training; and (2) what would be discovered by the kind of investigation that they would make in the exercise of reasonable prudence.

*Standard Oil Co. v. Anglo-Mexican Petroleum Corp., supra,* 112 F.Supp. at 637. The standard of reasonable prudence under the circumstances is familiar from tort law and has been applied in cases brought under COGSA. *See, e. g., California & Hawaiian Sugar R. Corp. v. Winco Tankers, Inc., supra,* 278 F.Supp. at 654, where the court stated:

The standard is not merely what ship owners usually do, but what a reasonably prudent one would do—and not what he might do in another vessel but in this vessel under the particular circumstances here present.

■ I am concerned with whether a reasonably prudent vessel owner would have *or should have, see General Food Corp. v. The Troubador,* 98 F.Supp. 207, 210 (S.D.N.Y. 1957), considered no inspection for the presence of cotter pins reasonable or sufficient under the circumstances. What is meant by "under the circumstances" is significant, for the responsibility imposed may change with the circumstances in issue. A useful guideline was proposed in a case under the Harter Act, the precursor of COGSA: " 'Due diligence' requires a carefulness of inspection and repair proportionate to the danger." *The Millie R. Rohannon,* 64 F. 883, 884 (S.D.N.Y.1894). The danger which arose from a missing cotter pin was the forced shutdown of the entire engine, which rendered the ship inoperative in mid-ocean.

■ Grave consequence itself does not, of course, preclude a finding of due diligence. *See Peter Paul, Inc. v. Rederi A/B Pulp, supra,* 258 F.2d at 905, where due diligence was found even though the ship broke in two because of a fracture of brittle steel. The court found that no test then known would have revealed the brittle state of the steel in the ship's structure:

[N]o test in 1943 or 1944 was in existence which would reveal the notch brittle quality of a steel, and at that time the dangers of such steel were just being uncovered. Liability cannot be imposed for failure to safeguard against a hazard not then generally known in the shipbuilding

industry and for failure to conduct non-existent tests . . .

It cannot seriously be alleged that the hazard from an absent cotter pin is not generally known in the shipbuilding industry. And tests for the presence or absence of cotter pins are not "non-existent". The test is a simple visual, or manual check, by hand or with a simple instrument. The check could be incorporated into the "hammer" test routinely performed by defendant. The addition of a cotter pin check may take more time and may require modifications of defendant's routine tests, perhaps entailing additional movement within the machinery or the removal of the inspection doors on the sides of the crankcase. But to require the shipowner to check for the presence or absence of cotter pins does not impose a burden which rises to the level of "unreasonableness". This is not a case, as in *National Sugar Refining Co. v. Motorship Las Villas, supra*, where "[e]verything possible was done, short of actually dismantling the valve itself, to be sure that the vessel was . . . in a seaworthy condition." 225 F.Supp. at 689. There is no indication that a test for the presence or absence of cotter pins will require dismantling of the engine.

The court in *Peter Paul, supra*, 258 F.2d at 906, held that the ignorance of defendant's master of the propensity of welded ships to cracks and its consequent lack of inspection for this danger did not establish lack of due diligence. Ship captains need not have the skills of naval architects and metallurgists:

> While a master is presumed to know the general characteristics of his ship, he is not required to possess the combined knowledge and skill of a naval architect and metallurgist.

In the case before me, one needs no special skills beyond those possessed by a ship's engineer to know the role a cotter pin plays in securing bolts in a ship's engine.

## VI.

I find that defendants failed to exercise due diligence to make the ship seaworthy prior to commencement of the voyage in issue.[7] Therefore, defendants are not entitled to General Average contributions, and plaintiffs are entitled to recovery of deposits paid to defendants.

---

**7.** Defendants contend that the test of "due diligence" under COGSA is to be applied separately as to each cargo involved and that the point of inquiry for the requirement of due diligence to make the vessel seaworthy "before and at the beginning of the voyage," 46 U.S.C. § 1303(1) (1975), is the port where each specific cargo was lifted. *In re Grace Line Inc.*, 517 F.2d 404, 407 (2d Cir. 1975). Thus, assert defendants, the requirement of due diligence relates to procedures in New York for cargo loaded in New York, to procedures in New Orleans for cargo loaded in New Orleans, etc. Defendants concede that the three-part test performed in New Orleans was not performed in any of the other U.S. ports where plaintiffs' cargo was loaded because the interrupted voyage of 7–10 days had not yet begun.

Defendants seem to be arguing for a rule of law which would obviate any requirement of due diligence in suits involving cargo which was loaded at a port other than the port immediately preceding the open ocean voyage. Such a rule is not tenable.

A shipowner must exercise due diligence as to all cargo; the due diligence test may apply to procedures at each coastal port, or a cumulative test may be applied as to procedures at the last coastal port. My finding that defendants' failure to test for the missing cotter pin in any port was an abrogation of the due diligence requirement of COGSA applies to all cargo loaded in the United States ports prior to the journey to the Mid-East. As to the New Orleans practice, the test performed was insufficient. If one views each port separately, the absence of any test at the other ports of departure was an even more severe lack of due diligence.

Moreover, an exception to the "port where lifted" rule of *In re Grace Line Inc., supra*, exists where the carrier "resume[s] the management of the ship at a subsequent port." *Id.* at 407, *citing May v. Hamburg-Amerikanische Gesellshaft*, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348 (1933). Although the court in *In re Grace Line Inc.* indicates that application of the *May* exception is often troublesome, I find no difficulty in this case. Defendants contend that they performed the routine three-part pre-voyage inspection of "Hellenic Glory" in New Orleans. Surely the performance of such a test constitutes resumption of management of the ship by the carrier. Therefore, defendants have failed to exercise due diligence as to all cargo even under a cumulative test applied to the procedures of defendant in New Orleans.

The foregoing opinion constitutes my findings of fact and conclusions of law, in accordance with Rule 52(a), F.R.Civ.P.

Defendants are to refund to plaintiffs the General Average deposits in the amounts indicated in the Pre-trial Stipulation dated December 17, 1976, plus interest at the rate of 6% from respective dates of payment. Costs are taxed to defendant. Submit judgment on two days' notice.

SO ORDERED.