**WING HANG BANK, LTD., Plaintiff,**

v.

**JAPAN AIR LINES CO., LTD., et al.,
Defendants.**

No. 69 Civ. 2548.

United States District Court,
S. D. New York.

April 17, 1973.

Hale, Grant, Meyerson, O'Brien &
McCormick, New York City, for plaintiff; Harold I. Meyerson and Vincent
J. Maroney, New York City, of counsel.

Donovan, Donovan, Maloof & Walsh,
New York City, for defendant Japan Air
Lines Co., Ltd.; Henry J. Robinson, Jr.,
New York City, of counsel.

Bigham, Englar, Jones & Houston,
New York City, for defendant American
Airlines Co., Ltd.; John L. Conners,
and Peter Vetro, New York City, of
counsel.

Cole & Deitz, New York City, for defendant National Bank of North America; Edward N. Meyer and Joseph A. DiBenedetto, New York City, of counsel.

ROBERT L. CARTER, District Judge.

### OPINION

On September 3, 1968, Wing Hang Bank (WHB) counted, packaged and sealed on its premises in Hong Kong $250,000.00 United States dollars of mixed denominations. The package, weighing 15.5 kilos and addressed to National Bank of North America in New York (NBNA), was taken to the Hong Kong airport for shipment to New York on Japan Air Lines (JAL). In the shipper's letter of instructions, the package is described under column "Nature and Quantity of Goods" as "United States Dollars Two Hundred Fifty Thousand (U.S. $250,000.00) only in bank notes." In the space for shipper's declared value under "For Customs" appears "$250,000.-00," but under "For Carriage" "NVD," which it is agreed means "no value declared," is written.

The package and shipper's letters were given to personnel of JAL for shipment to New York by air freight. Plaintiff, by declaring no value, secured the cheapest air freight rate which was $7.37 per kilo. On receipt of the package and shipper's letter, JAL made up an airway bill in thirteen copies for distribution to its personnel. On the face of this bill the shipment is described as "United States Dollars Two Hundred Fifty Thousand ($250,000.00)." In addition, a cargo manifest similarly indicating that the shipment contained $250,000.00 in United States currency was prepared in twenty-two copies. At Tokyo, for the final leg of the flight to New York, a cargo manifest in twenty-four copies again indicating the value of the package was prepared for distribution.

At approximately 3 P.M., New York time on September 3, 1968, NBNA received a coded cablegram from WHB stating that the latter was shipping that day via JAL $250,000.00, covered by airway bill number 131HKG1577854. Pursuant to agreement WHB would send to NBNA from time to time United States currency by air freight to replenish its credit balances. NBNA would pick up the bank notes at the airport in New York at its own expense. It was agreed that WHB would notify NBNA by cable of any forthcoming shipment to enable the latter to pick up the currency without delay.

The shipment arrived in New York on September 4, 1968, in the early morning hours at approximately 5:00 A.M. The package was removed from the plane and stored in a safe at JAL facilities at John F. Kennedy Airport (JFK). At that time JAL did not have facilities at JFK sufficient for storage of freight and custom clearance. Pursuant to agreement American Airlines (AAL) had assumed the obligation of providing storage and of processing through customs all terminating freight received from JAL.

At approximately 9:10 A.M., on September 4, 1968, the package was delivered by JAL to the custody of AAL for custom clearance and storage until picked up by the consignee. The shipment was stored by AAL in its Valuable Cargo Area. This is space in AAL Hangar 10 at Bay 10 which is enclosed by heavy wire and is kept under lock. The only key to the area is kept in the possession of the supervisor of the particular shift on duty. The area is patrolled by guards and is monitored by a closed circuit television. However, no particular employee on duty apparently was given any special responsibility to keep watch on the television, everyone being expected to keep an eye on the set while doing their other assigned duties.

AAL processed the package through customs and returned it to its Valuable Cargo Area to await pickup by NBNA. In the belief that Freeslate International was NBNA's authorized agent, AAL advised that agency of the arrival of the

package. Mr. Varone of Freeslate notified NBNA by telephone at about 4 P.M. on September 4 that the shipment had arrived, had cleared customs and was ready for pickup. Mrs. Gussy Brucato, an NBNA employee, received Mr. Varone's message. She called Wells Fargo requesting it to send an armored car to pick up the shipment but was advised that this could not be done that day but would be done the first thing the next day. In the early morning hours of September 5, armed robbers broke into the Valuable Cargo Area and stole plaintiff's package, along with other items in the cage.

## The Issues

Plaintiff concedes that the liability of the air carriers is governed by the Warsaw Convention. Article 18 makes the carrier liable for loss or damage to baggage, unless within the terms of Article 20 it has been proved that "all necessary measures to avoid the loss had been taken" or that it was not possible to take such measures. Article 22(2) limits carrier liability for freight loss to 250 francs per kilo "unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum if the case so requires." In that instance the measure of damages may be governed by the amount of value declared.

Plaintiff contends that the air carriers were guilty of willful misconduct in the handling of the security of the shipment at JFK and therefore, that their liability should not be on the basis of 250 francs per kilo but for the full amount of the actual loss. Plaintiff contends that NBNA has responsibility for the loss because it was negligent in not arranging for the currency to be picked up on September 4 and argues that NBNA breached its agreement with plaintiff in not so doing.

JAL and AAL contend that at best plaintiff's recovery is limited to 250 francs per kilo, and AAL counterclaims against JAL in the event the former is held liable to the plaintiff for the reason that as a part of its agreement with JAL to store its terminating freight and clear same through customs, JAL agreed to indemnify AAL against all claims for loss or damage. NBNA contends the case against it should be dismissed and that if it should be held liable to the plaintiff, it has a counterclaim against JAL and AAL to the extent of its liability on the grounds that it was the carriers' negligence that precipitated plaintiff's loss.

## Determinations

*Plaintiff's Contributory Negligence*: Much has been made of the fact that the plaintiff shipped the currency by air freight, with papers being prepared in manifold copies for distribution to JAL personnel broadcasting that $250,000.00 American dollars were being shipped on a JAL flight. I must confess that to ship $250,000.00 unmarked and unrecorded and, therefore, unrecoverable American dollars by air freight without paying extra so that full value would be insured against what in fact happened seems on the surface to constitute carelessness of the grossest sort. Plaintiff, however, was fully insured against loss and was reimbursed by its insurance company before this action was commenced. At any rate, whatever degree of care plaintiff failed to utilize in sending the currency to New York, its negligence cannot be said to have been the proximate cause of its loss. The shipment arrived safely at JFK and remained there for approximately twenty-four hours before being stolen. If the package had been picked up on September 4, this litigation would not have ensued. It was the time lag between the arrival of the package and its being picked up that contributed to the loss, not the method of shipment chosen by the plaintiff.

*The Carrier's Willful Misconduct*: Plaintiff's concession that the carrier's liability is governed by the Warsaw Convention is fatal. Willful misconduct within the meaning of that Convention is defined as the willful per-

formance of an act that is likely to result in damage or willful action with a reckless disregard of the probable consequences. See Pekelis v. Transcontinental & Western Air, 187 F.2d 122, 124 (2d Cir. 1951), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951); Grey v. American Airlines, 227 F.2d 282, 285 (2d Cir. 1955), cert. denied, 350 U.S. 989, 76 S.Ct. 476, 100 L. Ed. 855 (1956); American Airlines v. Ulen, 87 U.S.App.D.C. 307, 186 F.2d 529, 533 (1949); Berner v. British Commonwealth Pacific Airlines, 346 F.2d 532, 536–537 (2d Cir. 1965). Neither carrier can be held liable on the record of this case under that standard.

██ Indeed, it is difficult to term either negligent in the handling and processing of the shipment. JAL brought the package safely to New York; kept it under lock from the time of arrival at JFK on September 4 at approximately 5 A.M. until turning it over to AAL some four hours later for clearance through customs and storage until pickup. Although no value was declared, JAL treated the package as valuable cargo through its handling of the shipment. Whatever the declared value or lack of value declared, JAL knew that the package contained $250,000.00 in United States bank notes, and it treated the shipment accordingly.

Plaintiff contends that JAL knew that AAL security was poor and presumably was on notice not to turn the package over to AAL. Plaintiff has shown only one robbery at American approximately one year prior to the one here. That hardly makes out a case of poor security, since presumably during the year's span between the October, 1967 robbery and the September, 1968 robbery at issue here, much valuable freight had safely been moved in and out of AAL Valuable Cargo Area, including freight which AAL received from JAL

AAL had its Valuable Cargo Area under guard. While it is true that the guards patrolling the area were unarmed, that fact could not be said to have contributed to the robbery since robberies occur every day despite the presence of armed guards. In addition to the guards and closed circuit television, AAL had taken further steps to tighten security by limiting the number of its own personnel who would obtain advance notice of the impending arrival of valuable cargo, by employing professionals to handle security and by restricting access to the Valuable Cargo Area.

Moreover, on the basis of the evidence disclosed on this record, the proximate cause of plaintiff's loss was the armed robbery, and not the carelessness, malfeasance or misfeasance of the carriers. See Goepp v. American Overseas Airlines, 281 App.Div. 105, 117 N.Y.S.2d 276 (1st Dept. 1952). Therefore, unless willful misconduct were to be established which itself set the armed robbery in motion, plaintiff cannot recover from the carriers beyond the established limits of the Warsaw Convention. No such showing has been made. Therefore, the plaintiff's claims against the carriers for damages for its loss are limited to the prescribed 250 francs per kilo.

JAL was the carrier under direct obligation to plaintiff. AAL was merely its agent. Plaintiff is entitled to recover the authorized 250 francs per kilo from JAL for theft of its package.

[3] *The Liability of NBNA*: No liability either in contract or tort has been established in respect of NBNA. Plaintiff sent a cable notifying NBNA of the shipment of the currency. The cable informed NBNA of the airway bill number and indicated that the shipment was being carried by JAL, but no flight number or expected time of arrival was given. The method of shipment by air freight without a special declaration of value, the imprecise information given in the cable to NBNA, and the pattern of past shipments from WHB to NBNA (of twelve shipments made between October, 1967 and September, 1968 to NBNA, five had left Hong Kong so as to arrive in New York during the weekend shutdown of the bank) all indicate that plaintiff did not require or expect

NBNA to have an armored car waiting at the airport when the currency reached JFK. Indeed, the agreement itself manifests no such expectation by the parties. The plaintiff entered into the agreement with NBNA requesting that the latter assume the expense of moving the shipment from the airport to the bank. Had plaintiff considered the need to have an armored car at the airport once its shipment of currency arrived, it seems to me that plaintiff would have requested NBNA to provide this service at plaintiff's expense. In any event, the agreement would have expressly stated such undertaking if such had been the intention and no such provision is contained in the letters which constitute the terms of the contract between the parties.

Both the agreement and the plaintiff's own acts indicate an understanding that NBNA would proceed as it did in this case, *i. e.*, that when the shipment arrived in New York and NBNA was advised by the airline that the shipment had cleared customs and was awaiting pickup, NBNA would then make arrangements to pick up the money and to transport it to its bank. This was what was done. It is not clear why defendant was not notified before 4 P.M. on September 4 that the package was at the airport, but there is no proof that defendant NBNA bears any responsibility for the delay.

NBNA lived up to the terms of the agreement in all respects. On being notified, it sought to make arrangements to move the money from JFK without delay. Wells Fargo could not comply and thus the pickup was arranged for the following day. Before those arrangements could be put into operation, the robbery took place, but through no fault of NBNA. The case against NBNA is dismissed.

## The Counterclaims

All that remain are the counterclaims. NBNA's counterclaim falls, of course, with the dismissal of the action against it. AAL makes a claim against JAL for reimbursement for lawyers' fees and disbursements and costs arising out of its defense of the action.

The agreement between JAL and AAL contains the following indemnification clause:

"JAL agrees to defend, indemnify and hold American and each of its officers, agents and employees harmless from and against any claim, cause of action, suit, lien, loss, loss of use, damage, liability and expense (including costs of suit and counsel fees) arising out of the services performed by American hereunder and the coverage of this provision shall include, without limitation, damages to the property of American or other personal injuries and injuries resulting in death."

This sweeping indemnification agreement encompasses a situation such as the present where AAL is being sued for willful misconduct. In Levine v. Shell Oil Co., 28 N.Y.2d 205, 321 N.Y. S.2d 81, 261 N.E.2d 799 (1971), the New York Court of Appeals ruled that indemnification clauses should be read to give full effect to the intent of the parties, and that language ought not to be construed so as to nullify the plain meaning of such agreements. Here the broad reach of the language is such as to require that JAL reimburse AAL for all costs and expenses incurred by AAL in defense of the action.

Settle judgment on notice.