**MANUFACTURERS HANOVER TRUST COMPANY, Plaintiff,**

v.

**ALITALIA AIRLINES, Defendant.**

**No. 74 Civ. 3045(WCC).**

United States District Court,
S. D. New York.

April 13, 1977.

---

Hart & Hume, New York City, for plaintiff; William Hart, Robert B. Leonard, New York City, of counsel.

Condon & Forsyth, New York City, for defendant; Ronald E. Pace, John J. Quinn, New York City, of counsel.

OPINION

CONNER, District Judge:

On January 4, 1974, a Wells Fargo truck delivered a parcel of nondescript appearance to Cargo Building No. 86 [Building 86], the export operations facility of Alitalia Airlines at John F. Kennedy International Airport, Jamaica, New York. Within two hours of its delivery to Building 86 pending transport aboard Alitalia flight 611, the parcel—containing bank notes in the sum of $200,000 consigned to the Umma Bank of Tripoli, Libya—was to make an unscheduled landing in the hands of three gunmen. The latter, together with their prize, have to date escaped capture or recovery. What the gunmen gained, Manufacturers Hanover Trust Company lost, as shipper of the notes. Ultimate liability for that loss was the subject of a four-day, non-jury trial that began on June 8, 1976. This Opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P.

I.

At approximately one o'clock in the afternoon of January 4, 1974, James Brown, a security guard then employed by Beatty Protective Service, was dispatched to Building 86 on assignment, outfitted with street clothes, a .38 caliber police special, and the knowledge that he had been hired to guard high-value cargo of otherwise unidentified nature. Guided by Alitalia's assistant cargo manager and its deputy supervisor down a corridor fronted by offices, Brown was directed to a chair adjacent to an unmarked, locked door in view of a number of female typists. Thus stationed, Brown was instructed to, "Sit in this chair and watch the pretty girls." However pleasurable that initial scene according to Brown's subjective lights, the view became surely less agreeable shortly before 3:00 P.M., when Brown abruptly found himself looking into the barrel of a loaded revolver. Rather shakily holding the weapon was a man bearing the outward trappings of a Telephone Company repairman, accompanied by another similarly garbed.

Thus addressed by a gun, gripped as it was in an unsteady hand, and by the electrifying announcement, "This is a stick-up," Brown—choosing wisdom's course—eschewed the weapon in his shoulder holster and speedily retreated, with several Alitalia secretaries also in tow, through the corridor and into a men's room, obedient to directions of the gunmen.

Scant minutes earlier, the gunmen's initial contact with Nicola Amoruso, Alitalia's cargo operations manager, had been far more placid. Having proceeded into Building 86 through one of its unguarded entryways, and apparently having gained unchallenged access from the outer public area to the inner office area through a door marked "Authorized Personnel Only," the two had chanced upon Amoruso in their search for the Building 86 supervisor. After Amoruso had identified himself as the manager of operations, the pair explained that a communications problem had been traced to Building 86 and asked to be led to the building's telephone panel. The three-man procession down the corridor from Amoruso's office was suddenly halted, however, when—with revolvers freshly drawn and levelled at Amoruso—the gunmen declared their actual purpose, i. e., to get "the shipment of money." Initially frozen in terror, and eventually achieving movement only by force of the gunmen's prodding, Amoruso—attempting to remain at least visibly calm—followed his assailants' order to instruct other Alitalia employees not to use their telephones pending "repairs," the gunmen meanwhile secreting their weapons beneath their jackets. That done, Amoruso and a secretary were herded into a ladies' room, soon to be involuntarily joined in the approximately 5′ x 5′ area by a contingent of some ten or more co-workers.

Shortly thereafter, one of the gunmen reclaimed Amoruso from the ladies'-room crush and ordered him to "open up the strong room." The sole key to the Building 86 "valuables room" was contained, Amoruso knew, in a cabinet—itself normally locked—in the assistant cargo manager's office. Impelled by the gunman's apparent determination and impatience as well as by his weapon, Amoruso made his way to his assistant's office and discovered, to his relief, that the cabinet holding the valuables-room key had fortuitously been left open. With the key in his possession and the gunman at his heels, repeatedly threatening death if he triggered an alarm, Amoruso hastily repaired to the door of the valuables room—the post from which Brown had only moments before been unceremoniously relieved. The door was thereupon unlocked, revealing on the shelves within two lone packages. One, the parcel containing the bank notes, was promptly passed from Amoruso to the gunman. The second package, thereafter reported to have contained gold dental alloy worth some $60,000, apparently was ignored. Having served his fleeting purpose, and again being pushed toward the confines of the ladies' room, Amoruso noted that his two assailants had been joined by a third, a hooded figure without the Telephone Company gear of the others, but no less potently equipped with a gun.

Redeposited in the ladies' room, Amoruso joined his dozen or so colleagues resignedly awaiting deliverance. Their release came about five minutes later, when the door to the ladies' room was opened by Anthony Baldi, then the assistant cargo manager at Alitalia. During the major portion of the robbery's course, Baldi had been occupied by business that had taken him happily beyond Building 86 and that had kept him wholly unsuspecting of the drama within. Less happily, however, Baldi was to become a momentary participant in that drama upon his return to Building 86, when, accosted by the third gunman, he was first ordered to "freeze" and then to "turn around." Apparently dissatisfied with the execution of those commands, the gunman pistol-whipped Baldi before fleeing through one of the building's exits. Bleeding and dizzy, Baldi summoned enough wit to telephone the airport police. Sounds from the lavatories nearby eventually brought Baldi to the aid of his colleagues within. By this time, all of the gunmen had quit the premises.

Their ten-to-fifteen-minute captivity ended, the Alitalia employees eagerly emerged en masse from the lavatory, only to encounter five or six strangers with guns drawn, ordering them to "freeze." Assuming this new group to be a fresh wave of robbers, the former captives turned on their heels and ran "instinctively" back to the lavatory, a proven safe retreat. The armed men, however, were subsequently identified as members of the Port Authority police, dressed in civilian clothes, summoned scarcely minutes earlier by Baldi. Beyond the battery of police questions that inevitably would follow and the administration of necessary medical aid to the wounded Baldi, normalcy had returned to Building 86.

## II.

As noted at the outset, the bank notes stolen from Building 86 on January 4, 1974 have never been retrieved. The parties herein agree, as does this Court, that the extent of Alitalia's liability, if any, for that loss must be determined by reference to the Warsaw Convention [the Convention], as reproduced in its English translation at 49 Stat. 3000 (1934). See Article 1(1)–(2) of the Convention.

Articles 18 and 20(1) of the Convention set the measure of plaintiff's present claim, the former in relevant part providing that "[t]he carrier shall be liable for * * * loss of * * * any goods * * * during [the period in] which the * * * goods are in charge of the carrier * *," the latter providing that "[t]he carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures." Both parties herein apparently concede that Articles 18 and 20 in tandem operate to establish a presumption of carrier liability, in the event of a loss within the Convention's terms, that, in the present context,[1] may be rebutted only by defendant's persuasive proof that it took "all necessary

measures" to prevent the loss at issue. See *Wing Hang Bank, Ltd. v. Japan Air Lines Co., Ltd.*, 357 F.Supp. 94 (S.D.N.Y.1973); *Rugani v. K.L.M. Royal Dutch Airlines*, 4 Avi. 17,257 (N.Y.Ct. of City of N.Y.), aff'd, 285 App.Div. 944, 139 N.Y.S.2d 899 (1st Dep't), aff'd, 309 N.Y. 810, 130 N.E.2d 613 (1954); *Kraus v. Koninklijke Luchtvaart Maatschappij, N.V.*, 92 N.Y.S.2d 315 (Sup. Ct.N.Y.Co.1949); cf. *Grey v. American Airlines*, 227 F.2d 282 (2d Cir. 1955); Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497, 500 (1967).

Both plaintiff and defendant have devoted considerable efforts to explain and support their respective constructions of the phrase "all necessary measures." But, in the end, a common-sense reading serves best. Thus, notwithstanding plaintiff's argument to the contrary, this Court concludes that the phrase "all necessary measures" cannot be read with strict literality, but must, rather, be construed to mean "all *reasonable* measures." After all, there could scarcely be a loss of goods—and consequently no call for operation of Article 20—were a carrier to have taken every precaution literally necessary to the prevention of loss. Nor, on the other hand, may a carrier escape liability under Article 20, as Alitalia suggests, by demonstrating no more than its recourse to some—as opposed to all—reasonable measures. In short, Article 20 requires of defendant proof, not of a surfeit of preventatives, but rather, of an undertaking embracing all precautions that in sum are appropriate to the risk, i. e., measures reasonably available to defendant and reasonably calculated, in cumulation, to prevent the subject loss. Such construction finds implicit support in the few precedents squarely on point, see *Wing Hang Bank, Ltd. v. Japan Air Lines Co., Ltd. supra; Rugani v. K.L.M. Royal Dutch Airlines, supra,* and in the leading treatise on the Convention, see D. Goedhuis, National Airlegislations and the Warsaw Convention 217–38 (The Hague 1937).

1. Alitalia's affirmative defenses that plaintiff had been contributorily negligent and/or had assumed the risk of loss have apparently been abandoned. See Defendant's Post-Trial Memorandum at 14. Neither defense, it may be noted, finds support in the record.

968

With so much determined, the question of Alitalia's liability in the present case need not detain us long. Alitalia, the record makes clear, did undertake a number of measures, each intrinsically reasonable, to secure high-value cargo held in its custody. The existence and structure of the Building 86 valuables room; the armed guard hired specially to obstruct illicit access thereto; the log-book record of high-value cargo, conscientiously maintained; Alitalia's refusal to accept high-value cargo deliveries until an armed guard's arrival; certain precautions taken by Alitalia to prevent undue circulation of documents reflecting a shipment of high-value cargo—all combined to demonstrate that defendant had not been wholly unmindful of nor unmoved by considerations of security. But such precautions would be, predictably enough, likely unavailing in the circumstance of an armed robbery, as witness the scenario at Building 86 on the afternoon of January 4, 1974. To preserve against such eventuality, more could—and should—have been done. With unrestricted access into Building 86 and through it, the armed guard stationed on a chair at the valuables-room entrance was positioned no more securely than the proverbial sitting duck. As Alitalia's own witnesses agreed, restrictions on access to and through Building 86—or, at the least, an enclosure about the valuables-room and its guard—might have discouraged or frustrated robbery, if not insured against it. Moreover, armed robbery might have been prevented—or ultimately stymied—had a silent alarm system, with a direct connection to the Port Authority police station, been installed on the premises of Building 86. The costs involved in the installation and annual maintenance of such a system, i. e., $200 and $300, respectively, would have been more than reasonable in light of its robbery-prevention value.

We cannot say, of course, that such precautions would necessarily have averted the loss upon which the instant suit is based. Nor, for that matter, can we say that Alitalia's employees, under the circumstances in which they found themselves on January 4, 1974, could and should have acted otherwise for the sake of thwarting their assailants' purpose. We conclude only—but nonetheless fatally for the defense—that Alitalia did not take all reasonable measures that prudent foresight would have envisioned for the securing of high-value cargo.

Alitalia's reference to the fact that the January 4, 1974 incident at Building 86 was the first instance of armed robbery involving an airline cargo warehouse at Kennedy Airport is mentioned if only to demonstrate that it has not been overlooked. That armed robbers had so far spared such facilities could hardly have insulated the reasonably prudent airline carrier from the knowledge that an armed robbery of a cargo warehouse was a likely future contingency. Of no greater moment is defendant's observation that plaintiff had, within the space of some eighteen months preceding the robbery at Building 86, shipped without incident sixteen consignments of currency to the Umma Bank via Alitalia.

Equally unavailing to the defense is Alitalia's insistence that it necessarily be held to a standard of care no more rigorous than that observed by the majority of airlines at Kennedy Airport in 1974. In this respect, it is perhaps enough to note the following observations from Judge Learned Hand:

"There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. * * *. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required * * *." The T. J. Hooper, 60 F.2d 737, 740 (2d Cir. 1932).

See also Hageman v. Signal L. P. Gas, Inc., 486 F.2d 479, 483 (6th Cir. 1973); Tormo v. Yormark, 398 F.Supp. 1159 (D.N.J.1975); George v. Morgan Construction Co., 389 F.Supp. 253 (E.D.Pa.1975).

Other airlines at Kennedy Airport, at least until January 1974, may well have

been less security conscious than was Alitalia; few, if any, may have been more so. Nevertheless, if other airline cargo facilities might have been as, or more, awkwardly situated in the face of an armed robbery than was Building 86, that fact cannot confer added grace to Alitalia's posture herein.

### III.

Under Article 22(2) of the Convention, carrier liability for the loss of freight must be limited to the sum of 250 francs per kilogram "unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum if the case so requires." Appearing on the face of Air Waybill No. 055–3807–7830, the contract of carriage covering the bank notes now at issue, is plaintiff's special declaration of value in the amount of $200,000. Plaintiff has paid all charges imposed by the defendant carrier in connection with the air waybill, including a supplemental valuation charge of $200. In such event, the measure of plaintiff's damages is determined by the amount of value thus declared. See *Orlove v. Philippine Air Lines, Inc.*, 257 F.2d 384, 387–88 (2d Cir.), *cert. denied*, 358 U.S. 909, 79 S.Ct. 230, 3 L.Ed.2d 230 (1958).

In accordance with the foregoing, plaintiff shall have judgment in the amount of $200,000, with interest thereon at the rate of six per-cent per annum computed from January 4, 1974, plus costs.

Submit judgment order on notice.